OF THE

# STATE OF MISSOURI,

AT THE

## APRIL TERM, 1892.

---

*Continued from Volume 110.*

---

ROTHENBARGER *et al.* v. ROTHENBARGER *et al.*, *Appellants.*

---

Division One, June 20, 1892.

---

**Equity:** SUIT TO CANCEL DEED: FRAUD. In a suit to cancel a deed because obtained by fraud and undue influence it appeared that the plaintiffs' two sisters were each given by their father, on a division of his property, eighty acres of land worth $50 per acre; that the deeds were given by the father to one of the sisters with directions for them to be kept in a trunk until after his death when they were to be recorded, and the possession of the property taken; that after the death of the father the defendant, who was plaintiffs' older brother, by representing the deeds were valueless and could be canceled, and threatening to bring suit against plaintiffs, forced them to make the deed in suit; that the deed was made without consideration or advice. *Held*, that plaintiffs were entitled to the relief they asked.

*Appeal from Jasper Circuit Court.*—HON. M. G. MCGREGOR. Judge.

AFFIRMED.

(1)

*McReynolds & Halliburton* for appellants.

(1) The deeds from Solomon Rothenbarger to plaintiffs, Sarah E. and Susan M., were never delivered. The evidence shows not only that they were never delivered, but that they were not intended to be delivered during the lifetime of Solomon Rothenbarger. *Huey v. Huey*, 65 Mo. 689; *Hammerslough v. Cheatham*, 84 Mo. 13; *Turner v. Carpenter*, 83 Mo. 333; *Sneathen v. Sneathen*, 104 Mo. 201. (2) To set aside a deed for fraud and undue influence the evidence must be clear. *Shields v. Hickey*, 26 Mo. App. 194; *Briant v. Jackson*, 99 Mo. 585; *Webb v. Darby*, 94 Mo. 621; *Shinnabarger v. Shelton*, 41 Mo. App. 147. (3) Compromises are favored by the courts and especially so in family matters, and under the evidence in this case the bill should have been dismissed on that branch of the case, and the compromise in this case was full and fair with a full knowledge' of the facts after advising with a disinterested person. (4) To constitute a good delivery of a deed it must appear that grantor parted with all dominion and control over the instrument intending it to take effect and pass title as a present transfer. "The evidence shows that Rothenbarger did not intend the deeds to take effect until after his death; that he did not part with control over them." See authorities cited under point 1. The plaintiffs in this case are estopped by their own laches. The quitclaim deed made by them was made January 3, 1885, and this suit was not commenced until 1889. *Burgess v. Railroad*, 99 Mo. 496; *Mathias v. O'Neil*, 94 Mo. 520; *Murdock v. Lewis*, 26 Mo. App. 234.

*Thomas & Hackney* for respondents.

(1) The testimony in the case is ample to support the finding of the chancellor, that the deeds exe-

cuted by Solomon Rothenbarger to the plaintiffs were delivered in his lifetime. The delivery of the deeds by the grantor to the plaintiff Ellen was a sufficient delivery to vest the title in the grantees of the deed, and at such delivery the title passed to them, notwithstanding the deeds were not to be placed on record until after his death, and although the deeds were placed in his trunk to remain until after his death. *Sneathen v. Sneathen,* 104 Mo. 201; *Burke v. Adams,* 80 Mo. 506; *Standiford v. Standiford,* 97 Mo. 231; Tiedeman on Real Property, sec. 814; *Squire v. Summers,* 85 Ind. 252; *Ball v. Foreman,* 37 Ohio St. 132. (2) The testimony is ample to sustain the finding of the chancellor that the deed from the plaintiffs, sought to be set aside, was procured by fraud and undue influence. *McClure v. Lewis,* 72 Mo. 304; *Cadwallader v. West,* 48 Mo. 491; *Garvin v. Williams,* 44 Mo. 465; *Rankin v. Patton,* 65 Mo. 378; *Street v. Goss,* 62 Mo. 228.

BRACE, J.—This is an action to set aside a quitclaim deed executed by plaintiffs, Sarah Ellen and Susan M. Rothenbarger, dated January 3, 1885, whereby, for the consideration of $1, they conveyed all the interest acquired by them by two deeds made to them by their father, Solomon Rothenbarger, and his wife, in the southeast quarter and the southeast quarter of the northeast quarter of section 36, township 28, range 33, in Jasper county, to the heirs of said Solomon, deceased, to take in accordance with the provisions of the will of said Solomon dated March 15, 1881, on the ground of fraud and undue inflence. From the decree of the circuit court setting aside said quitclaim deed the defendants appeal.

It appears from the evidence that in October, 1883, Solomon Rothenbarger of advanced age and in feeble health was living on his farm in Jasper county, of

which the premises in question formed a part; that his family consisted of his wife, Jane, his oldest son, Jacob, a younger son, John, and his two single daughters, the plaintiffs, Sarah Ellen and Susan M.; that he had been an invalid for some years, and his business was being managed by his oldest son, Jacob, who was a strong-willed and imperious man, to whom the younger children were in the habit of yielding obedience; that Sarah Ellen and Susan M., the youngest of the children, were raised on the farm, had no business education or experience other than such as falls to the lot of girls whose whole time is engaged in household duties and in attendance upon their sick father. That previous to the sixth of October, 1883, he had conveyed eighty acres of his farm to his son Jacob; that on that day he duly executed and acknowledged before a notary public by the name of Webb four deeds, one to his wife for eighty acres, one to his son John for ninety acres, one to his daughter Sarah Ellen for eighty acres, and one to his daughter Susan M. for eighty acres.

Sarah Ellen testifies: The first I knew anything about the deeds father had B. T. Webb in the house making the deeds; he said, 'Ellen, which piece of land do you want?' I said, 'I want the piece Turkey creek ran through.' He said, ' No, I will not give that to you, I will give that to Susan.' '' After the deeds were signed and acknowledged (she continues) ''father said, 'Ellen, here is your deed, and here is Susan's, and here is your mother's deed, and there is John's; place them in that trunk till after my death; after my death they are to be recorded, and they are to be yours, and there is to be a division of the land.' ''

Susan M. testifies: ''I saw father hand sister Ellen the deeds, and he said, 'Take these deeds; here is Susan's and your mother's and John's deed, place

them in that trunk until after my death, and then you girls will have that land; it will be divided then.'"

Mrs. P. J. Ware, one of the defendants, and a sister of the plaintiffs, testified that she had a conversation with her father about the deeds a short time after they were executed, in which he said: "I made Sue and Ellen and John and mother a deed. I have given their deeds to Ellen until my death." He said: "I gave the east part of the farm to Susan, the next was Ellen's, the home place where the house was, he said was Ma's, and next adjoining Jake's was John's;" he said "I deeded Jake his land several years ago."

These are the only witnesses who undertake to give the language of the grantor in respect of the disposition he desired made of the deeds which he had signed and acknowledged, and their evidence is set out so far as they undertook to give his words on that subject.

John Rothenbarger, one of the defendants, who it seems was not present when the deeds were signed and delivered, testifies that he received his deed from his mother, he thinks, the same day it was executed at his father's bedside, who told him to take it and keep it, but not to put it on record until after his death, and that he had made the other deeds.

Jacob Rothenbarger for the defendants testified as follows on this branch of the case:

"*Q.* What was done about signing and acknowledging? *A.* I was not in the house and know nothing about it.

"*Q.* Were you there when they were put away after they were signed and acknowledged? *A.* I was.

"*Q.* What was done with them? *A.* I can't say what was done with John's; it was left on the table. The girls' deeds were put in the old man's trunk. The old lady's deed was put in my trunk by myself.

"*Q*   Who took the two deeds to the girls, and put them in your father's trunk?   *A.*   I did.

"*Q.*   Why did you?   *A.*   The old man told me to.

"*Q.*   What did he say about what was to be done with them?   *A.*   They were to be left there until after his death; that is all he said at that time.

"*Q.*   Who did he tell to put them in the trunk? *A.*   He told me."

The deeds of the girls remained in the trunk in their father's room from the time of their execution until after the death of their father; unless perhaps taken out temporarily by some member of the family, all of whom had access to the trunk which was either unlocked, or, if locked, the key was put in the clock on the mantel.   It does not appear that Solomon Rothenbarger ever rose from his bed after the execution of these deeds; but thereafter he had to be "bathed, rubbed, waited on and lifted" in bed by his attendants; this daughter, Sarah Ellen, was his nurse, gave him all his medicine and was in immediate charge of him and his surroundings, while the other members of the family attended to the duties of the farm and household and rendered such assistance from time to time as the exigencies of his situation demanded, until his death which occurred in the summer or fall of 1884.

It seems the widow and John came into possession of their deeds, and their right to hold their land under them remains unquestioned.   Not so, however, with the deeds to the girls.   Some time after the death of their father, Jacob Rothenbarger, who qualified as executor, and his brother-in-law, Harvey Chitwood, who went on his bond as such, took Solomon Rothenbarger's will to the county seat for probate and to procure letters of administration on the estate.   Upon their return, they demanded the deeds from the girls, and, thereupon, commenced a system of intimidation and

misrepresentation that finally resulted in the execution of the quitclaim deed in question by the girls.

The following extracts from their evidence, which is sustained by the other evidence in the case, illustrates sufficiently the means by which those deeds were procured.

Sarah Ellen testified: "After Jacob and Chitwood had returned from Carthage, where they had probated the will, Chitwood commenced on us in the sitting-room. Mother and I got up and went into the kitchen, and he followed us out there and said, 'If you don't give up those deeds we will sue you, and for $100 we can get them. We will sue you until you don't have a wrap to your person.' Jake said the deeds were no good, and that Webb made them just to please father, and that the doctor said that father was not fit to do business. He said that, if we did not give them up, he could not get any bondsmen on his bond. Then Jake afterwards came to the milk lot where Susan and I were and cursed and swore about the deeds ever so many times, and said for $100 they could sue us and get them away. He said if we did not give those deeds back he would sue us and make us leave home, and we could not have our home there; and we had to do it in order to have a home. I thought I had to give it up. He compelled us to make the deeds by threats."

Susan M. testified: "He made us girls do as he pleased; he made us do just as he pleased, as near as he could. Brother Jake said to Ellen and me, that father was not in his right mind when he made the deeds, that Dr. Wells told him he was not competent, and that he could not get any bondsmen unless we put the land back in the estate. He said Webb said he just made the deeds to please father; that the deeds were not any account. He said we had to give them

up or that he would sue us until we did not have a wrap to our persons; Chitwood said that, and he said for $100 they could get the deeds. They said the deeds were not of any account; that they did not represent any land. Chitwood came twice after us, and Jake after us all the time, until we made that deed. Chitwood was cursing, and said 'God damn you, you have got to give them up,' and all such stuff as that. To be plain, his habits were bad; he drank considerable. We were afraid of him. We made the deeds so we could have a home to live there on the place where we always had lived, and to keep peace. Jake said he ought to have kicked us girls out of the house long ago, and God damn us to hell he would do it, too. We received no consideration for making the deeds."

The evidence tends to show that at the time the quitclaim deed was executed by the plaintiffs the land was worth at least $50 per acre; that they had no correct appreciation of the value of the property, and were unadvised of their legal rights in the premises. It is not pretended that any consideration was paid the girls for the deed at the time of its execution, but it is alleged in the answer that it was made upon an agreement with the other heirs that they would pay plaintiffs $500 therefor, and there was evidence to prove such an agreement; and that, at some time between the date of their deed and the seventh of August, 1888, the executor Jacob had executed and delivered to them his notes for a part of that amount, and $200 had been paid them with money obtained from their mother who, in this whole proceeding, seems to have moved only as she was moved upon by her oldest son, the executor. That a dispute arose between Jacob and his sisters about the amount that was due them on the notes, and he refused to pay them. That the sisters sought the advice of a Mr. Dale, an old friend of their father's, who refused

to advise them, however, but consented to hear the statements of the parties in the presence of each other, and then give his opinion in the matter; which he accordingly did, after having been first *seen by Jacob*, afterwards met by him and conducted to the scene of action. He embodied his decision in the form of the following receipt which he prepared and signed, and which the plaintiffs also signed:

"JOPLIN, JASPER Co., Mo., August 7, 1888.

"Received of Jane Rothenbarger $415, it being the amount agreed upon by the heirs of Solomon Rothenbarger, deceased, to be paid to us out of any money coming into the hands of the executors of aforesaid deceased, in consideration of a certain deed executed by us on the third day of January, 1885, to the heirs of said Solomon Rothenbarger, deceased, retaining our heirship in the land therein conveyed, it being understood by us that the payment by Jane Rothenbarger to us, after settlement of the estate of said Solomon Rothenbarger, is the same as to the heirs as if it had been paid by the executor, and the remainder paid to Jane Rothenbarger according to the provisions of the will; also that none of the payment herein named shall be charged against us in the final distribution of said estate after the death of Jane Rothenbarger, widow of said deceased.

"SUSAN M. ROTHENBARGER,

"SARAH ELLEN ROTHENBARGER.

"Attest: R. J. DALE."

Whereupon the amount mentioned in the receipt was paid them, Dale's expenses and charges for his services paid, and the deeds from the father to the girls given him, with money to pay for recording them by Jacob, and the deeds taken by Dale to the recorder's office, and with the receipt filed for record, and recorded on the eighth of August, 1888. Thus this valuable

estate which the father intended for his single and unprotected daughters who had so faithfully devoted the fresh years of their early womanhood in ministering to his wants and comforts during the many long months and years that preceded his dissolution was attempted to be wrested from them for a mere "mess of pottage." The foregoing presents the salient features of the plaintiffs' case; we have carefully read all the evidence introduced by the defendants to meet it, or impair its force, and after giving it due consideration are of the opinion that the whole evidence sustains the following finding of the circuit court.

"The court finds from evidence that Solomon Rothenbarger executed the deeds read in evidence to plaintiffs respectively, and handed them to plaintiff Sarah Ellen for both plaintiffs; that same constituted a delivery of the deeds, and shows that he intended to part with his dominion over them, even if he did direct they should be put and kept in his trunk till after his death. From all that transpired it only shows an intention on his part that plaintiffs should hold their said deeds, but not record, or divide, or take possession of the land until after his death.

"The court finds that the quitclaim deed from plaintiffs was procured by fraud and undue influence; that is, that plaintiffs were not made acquainted with their rights, and were induced to believe that they could not hold their land without great difficulty, and that their title thereto was not good, and said deed was not made voluntarily on their part, but was made under a misapprehension of their rights, induced by defendants, who were bound to disclose all the facts. It is not pretended that a fair consideration was paid for the land."

These two brief paragraphs contain the substance of the "law and testimony" of the case, tersely

expressed.   The finding of facts is supported by the weight of the evidence and the declaration of the law by the authorities cited by counsel on each side, when properly considered.   Upon this finding the following righteous decree was entered:

"It is decreed that on plaintiffs' repaying to defendants on or before the first day of August, 1890, the sum of $1,410 paid by them, including amounts received by plaintiffs as legatees under the will and six-per-cent. interest thereon from this day, that said quitclaim deed for the land described be set aside, and that defendants reconvey the interest acquired thereby to plaintiffs, and that the land conveyed to plaintiffs by their father be treated as an advancement to them, and that on default of plaintiffs paying said sum with interest that said land be sold by the sheriff of Jasper county in same manner as on execution, and that out of the proceeds arising therefrom the estate of Solomon Rothenbarger be paid said sum of $1,410 and interest from this date, and the balance, if any, be paid to plaintiffs, and that plaintiffs recover costs."

The only change we find it necessary to make in this decree grows out of the lapse of time since it was rendered, and the minority of some of the defendants; it will be accordingly so amended as to allow the plaintiffs until the first day of October, 1892, to pay said sum of $1,410 and interest to the defendants or into court for their use, upon payment of which amount the legal title shall be declared vested in the plaintiff, and so amended will be affirmed and certified to the circuit court for execution.   All concur, except BARCLAY, J., absent.