# MANCIL G. COOK v. LAURA A. NEWBY, JOHN H. NEWBY and HARRIETT COOK, Appellants.

### Division One, July 3, 1908.

1. **STIPULATION FOR JUDGMENT: Incomplete.** Where the pleadings admit and the proofs show that the stipulation for judgment did not contain all the compromise agreement, the chancellor does not err in refusing to specifically enforce the terms of the stipulation.

2. ———: ———: Warranty Deed: Provision for Occupancy. Where plaintiff charges that the warranty deed of himself and wife to their daughter and her husband was fraudulently obtained and fraudulently recorded, and sues to have it set aside, and defendants plead a written agreement for judgment, which does not contain, as their answer admits and avers, a stipulation that plaintiff and his wife were to have a joint occupancy and use with defendants of the premises for life, and that they were to be paid $100 annually for certain stock, and the proof shows that those things were a part of the agreement to compromise the suit, though not incorporated therein, and the written agreement provides for an unconditional decree vesting the fee simple title in defendants and divesting plaintiff and his wife of all interest and right in said land, the cause being in equity and the stipulation executory, the chancellor did not err in refusing to enter judgment in accordance with the terms of the written stipulation for judgment.

3. ———: ———: Consultation of Attorneys: Old and Illiterate Party. Where the scheme for compromising the litigation pointed to a consultation of attorneys and the agreement was drawn by defendants' attorneys and forwarded to them, in the expectation that it would be submitted to plaintiff's attorney, and that was not done, and plaintiff was old and somewhat illiterate, and did not understand the force and drastic effect of the stipulation, and needed counsel, and defendants unduly hurried its execution, and plaintiff executed it under incidents of surprise, accident and mistake as a settlement of a family imbroglio, there is a case that appeals strongly to the conscience of the chancellor when he is asked to specifically enforce the stipulation, although the testimony does not warrant a finding that defendants perpetrated a fraud upon plaintiff or misled him as to the legal effect of the paper.

4. **SETTING ASIDE DEED: Land Bought With Wife's Money: Inconsistent Theories.** When asked by the grantor of land to re-

turn his title, the grantees may not claim to take under the deed and at the same time mend their hold on the land by denying the grantor's original title. The grantees may not claim to take under his deed, in which his wife released her inchoate dower, and when he sues to have the deed set aside as fraudulent, and she is joined as a defendant, hark back to the origin of the grantor's estate in the land and add to their holding by showing that, prior to the married women's enabling acts, the land was purchased with his wife's money and the title taken in his name. The two theories are inconsistent. The grantees must stand or fall upon the theory upon which they dealt with the grantor, namely, that the land belonged to him and was conveyed to them upon a valid delivered deed.

5. **HURRIED TRIAL: Impatient Chancellor.** The appellate court is not concerned with questions relating to the chancellor's patience or impatience at the trial. The vital question on appeal is whether or not, in the light of the facts, the decree does equity. Besides, the exclusion of extraneous issues, even in an equity case, does not indicate impatience.

6. **EVIDENCE: Letter: Written by Agent.** He who does a thing by another does it himself. A letter written by plaintiff's wife at his request and with his knowledge, to defendants, asking them to come home and offering to give them the home place if they would do so, is competent evidence, and is admissible for what it is worth.

7. **CONVEYANCE: Delivery: Intention.** What constitutes delivery of a deed is a question of intent, a mixed question of law and fact; and that intention may be got at by what was done before and at the time, and may be what happens afterwards is of value.

8. ——: ——: **To Third Party.** When a deed, signed and acknowledged, is placed in the hands of a third person, to be held for the benefit of the grantee, with intent to part with dominion over it, and to be recorded at the grantor's death, that constitutes a good delivery in the eyes of the law, if the grantee accepts it.

9. ——: ——: ——: **Cancellation: Premature Record.** After verbal promises were made and broken by plaintiff for the return to the home place of plaintiff's daughter and her husband, to take care of him and his wife, and after they had later returned under plaintiff's agreement to convey the farm to them and his failure to keep that agreement and their removal again, plaintiff and his wife as a condition precedent to the return of the daughter and her husband, to take charge of the farm and live with them, executed a warranty deed in ordinary form, reciting a consideration of one hundred dollars and love

and affection, and conveying the property to the daughter and her husband, and delivered it to a third party, and by written memorandum authorized him to hold the deed during their life-time and at their death to cause the same to be recorded and then to deliver it to the grantees, and further in said memo-randum relinquished "all right and title to said farm excepting possession and use during our lifetime." Thereafter the grantees moved to the farm, lived with plaintiff and his wife, and took charge of the farm, and the cause was not tried on the theory that the grantees had not complied with their agreement. A year later the deed was brought home by plain-tiff's wife and remained for some time in the house, and was then recorded, and there is testimony that it was recorded with plaintiff's knowledge and consent, but also evidence to the contrary. *Held*, that plaintiff parted with dominion over the deed when he signed and acknowledged and delivered it to the depositary, and when the grantees accepted it by the performance of the conditions which induced its execution; and it cannot be set aside on the theory that it was prema-turely put of record. A present interest had passed on the com-plete delivery of the deed to the third party for the daughter and her husband.

10. ——: ——: ——: **Recall.** A deed placed by the grantor in the hands of a third party with unconditional instructions to deliver it to the grantee upon the death of the grantor and without any reservation in the grantor of the right to revoke or recall it during his lifetme, operates to vest the grantee with a present interest in the land, which the grantor cannot there-after revoke or recall or destroy by the simple expedient of re-taking possession of the deed.

11. ——: ——: ——: **Life Estate: Contemporaneous Memo-randum.** But the placing of the deed in the hands of a third party with unconditional instructions, evidenced by contempor-aneously signed memorandum, to record it on the grantor's death and then deliver it to the grantee, especially where pos-session and use during the grantor's life are not relinquished by the memorandum, creates a life estate in the grantor. In such case the memorandum is a part and parcel of the trans-action, and should be read into the deed.

12. ——: ——: ——: ——: **Joint Use and Occupancy.** But where the arrangement entered into shows that the deed was made in the expectation and intention that the grantees would have a joint use and occupancy of the premises with the grantors, the life estate which the law creates in the grantor, predicated of the contemporaneous memorandum, is qualified by adding thereto the right of joint occupancy on the part of the grantees.

Appeal from Gentry Circuit Court.—*Hon. W. C. Elli-son,* Judge.

REVERSED AND REMANDED (*with directions*).

*Platt Hubbell and George Hubbell* for appellants.

(1) The execution of the deed and its delivery to Axtell was in law a delivery to Laura A. Newby and John H. Newby, and conveyed the title to them in *praesenti.* 13 Cyc. 568, 570; White v. Pollock, 117 Mo. 467; Williams v. Latham, 113 Mo. 165; Standiford v. Standiford, 97 Mo. 231; Foreman v. Archer, 130 Iowa 49; Freeman v. Trummer, 91 Pac. 1075; Tiedeman on Real Property, p. 650, sec. 815; Crowder v. Searcy, 103 Mo. 97; Martindale on Convey., secs. 211, 221, 225. (2) Since the terms on which Axtell held the deed were reduced to writing, parol testimony is not admissible to contradict or vary those terms. Hilgar v. Miller, 72 Pac. 319; 9 Encyc. of Ev., p. 437; Ashley v. Bird, 1 Mo. 442; Lance v. Price, 5 Mo. 101; Jones v. Jeffries, 17 Mo. 577; Boggs v. Laundry Co., 171 Mo. 282; Bunce v. Beck, 43 Mo. 266; McMahon v. Turney, 45 Mo. App. 103; Neville v. Hughes, 104 Mo. App. 455; Deuser v. Hamilton, 52 Mo. App. 394; White v. Watts, 118 Iowa 549. (3) Even if parol testimony were admissible to contradict or vary this written memorandum, plaintiff has failed to establish his allegation that the grantors reserved the right to recall this deed. White v. Watts, 118 Iowa 549; Construction Co. v. Tie Co., 185 Mo. 25; Cook v. Foley, 152 Fed. 41. (4) The delivery to Simms only substituted Simms as the depositary in the place of Axtell. The rights of the parties became fixed by their delivery of the deed to Axtell. (5) Plaintiff has failed to establish his allegation that he did not consent to this deed being removed from the custody of Simms and recorded. Foreman v. Archor, 130 Iowa 49; Hoffmire v. Martin, 45 Pac. 754, 29 Ore.

240. (6) Plaintiff is bound by the stipulation of settlement. Powell v. Adams, 98 Mo. 598; Robinson v. Bobb, 139 Mo. 346; Crim v. Crim, 162 Mo. 544; McKissock v. Groom, 148 Mo. 459; Studybaker v. Cofield, 159 Mo. 596; 20 Encyc. of P. & P. 629, 632, 662. There was a valid consideration for the deed and for the stipulation. Taylor v. Crockett, 123 Mo. 300; Edwards v. Latimer, 183 Mo. 610; 6 Am. and Eng. Ency. Law (2 Ed.), 694, 712; 14 Ib. 1034, 1035. (7) A court of equity will not make a bargain or a contract for the parties, but will enforce the bargain and contract that the parties have made. McElroy v. Masterson, 156 Fed. 42.

*E. C. Lockwood, W. F. Dalbey* and *C. H. S. Goodman* for respondent.

(1) The deed was never delivered as a deed. Delivery is the transferring of a deed from the grantor to the grantee in such manner as to deprive him of the right to recall it. 1 Bouvier's Law Dict. (11 Ed.), p. 396; 3 Washburn, Real Property (6 Ed.), sec. 2143. (2) Without delivery the deed was invalid as a conveyance of title. 3 Washburn, Real Property (6 Ed.), sec. 2144. (3) In order to constitute a delivery within the meaning of the law the deed must have altogether passed from the dominion and control of plaintiff. 3 Washburn, Real Property (6 Ed.), sec. 2148. (4) It is immaterial for the purposes of this case what was the nature of the title conveyed by the instrument deposited with the Bank of McFall, the issues being the delivery of the deed and its being placed of record without authority of plaintiff. (5) Oral testimony of the circumstances attending the execution of the deed and its deposit with the Bank of McFall was admissible. 1. A parol contemporaneous agreement independent of and not inconsistent with the one reduced to writing is admissible in evidence. Greening v. Steele, 122

Mo. 287.  2.  Where a part only of a contract is put in writing the omitted part may be established by parol. Greening v. Steele, 122 Mo. 287; Brown v. Brown, 90 Mo. 190; Black River Lumber Co. v. Warner, 93 Mo. 374; Edwards v. Smith, 63 Mo. 119; Bunce v. Beck, 43 Mo. 266; Moss v. Green, 41 Mo. 390; Rollins v. Claybrook, 22 Mo. 405; O'Neil v. Crain, 67 Mo. 250; Ellis v. Bray, 79 Mo. 227; Life Assn. v. Cravens, 60 Mo. 388; Roe v. Bank, 167 Mo. 406; 2 Burr Jones, Ev., sec. 445, p. 980; 1 Greenleaf, Ev. (12 Ed.), secs. 304-305r.  (6) The deed in question was always subject to the grantor's control, and in such case there is no delivery. Prutsman v. Baker, 30 Wis. 644; Huey v. Huey, 65 Mo. 689; 2 Greenleaf, Ev. (8 Ed.), sec. 297; Jackson v. Phipps, 12 Johns. 421; Standiford v. Standiford, 97 Mo. 231; Tyler v. Hall, 106 Mo. 313; Scott v. Scott, 95 Mo. 300; Rogers v. Carey, 47 Mo. 232; Mudd v. Dillon, 166 Mo. 110; Bunn v. Stewart, 183 Mo. 375; Stokes v. Anderson, 4 L. R. A. 313.  (7)  The stipulation pleaded by the defense as a bar to the further prosecution of this suit is executory, without consideration, and unconscionable, and as such is incapable of being enforced in a court of equity.  He who comes into a court of equity must come with clean hands.  1 Pomeroy's Eq. Jur., secs. 397, 400, 404; Miller v. Kilsay, 114 Mo. App. 598; Coleman v. Dannenberg Co., 103 Ga. 784; Gottfried v. Bray, 106 S. W. 639.

LAMM, J.—By his bill in equity, and a count at law in ejectment, plaintiff sued the Newbys to set aside an unconditional warranty deed to 120 acres of land in Gentry county, Missouri, and the record of it, and to recover possession of the land.  Such steps were taken that Harriett, wife of plaintiff, became a party defendant.  A decree on the equity side going in favor of plaintiff and a judgment of ouster with one cent dama-

ges going on the count in ejectment, all the defendants appeal.

The equity count in substance sets forth that plaintiff is the owner of the land; that on July 20, 1903, he and his wife Harriett signed and acknowledged a warranty deed conveying the land to the Newbys, as husband and wife; that the deed was not delivered but was left with a depositary to be held until demanded by plaintiff; that without plaintiff's consent or knowledge the Newbys fraudulently obtained possession of it and caused it to be recorded for the purpose of defrauding plaintiff out of the land; that the deed purports to be for a consideration of the love grantors bore the grantees, and $100, but that said $100 and no other consideration was paid plaintiff for the land; that the deed and the record thereof are void and constitute a cloud upon plaintiff's title; wherefore, a decree is prayed adjudging plaintiff the legal and equitable owner of the real estate, that the deed and its record be cancelled, and for all proper relief.

The count in ejectment is conventional.

The Newbys filed an amended answer subdivided into counts, viz.:

The first count was a general denial of each and every allegation, saving those expressly admitted.

The second count states the deed was executed by plaintiff and his wife in the form of a general warranty and conveyed to the Newbys the real estate described; that it was for a good and valuable consideration acknowledged by grantors, and was duly put of record; that by virtue of it grantees are the owners of the land in fee simple absolute; that the plaintiff claims some title or right in and to said real estate, wherefore affirmative relief is asked [under section 650, R. S. 1899], to-wit, that the court ascertain and determine the title and right of the parties respectively and adjudge and decree title and for any other proper relief.

By the third count the Newbys say the deed was in the nature of a family settlement, giving to Laura A. Newby the portion she was to receive in the estate of plaintiff and his wife Harriett. That the defendant Laura A. is the child of Mancil G. and Harriett Cook and intermarried with her codefendant, John H.; that theretofore Mancil G. and Harriett had conveyed to their other children certain real estate by way of family settlement. By way of matter of inducement leading up to the conveyance, it is next alleged that Mancil G. and Harriett after the marriage of Laura A. contracted with her and her husband that the Cooks and Newbys were to live on the home farm and divide the profits in consideration of the Newbys assisting in maintaining a home for Mancil G. and Harriett. That they entered into the performance of said agreement and the Newbys made valuable improvements on the farm, but the plaintiff, Mancil G., violated the contract and rented the farm to others and the Newbys then moved to a farm near Cameron, Missouri. That afterwards, Mancil G. and Harriett induced them to return under an agreement to convey the farm to them, but, on their compliance, negelected to make the deed pursuant to the agreement. That thereupon in March, 1903, the Newbys moved from the farm and rented another adjacent; that in July, 1903, the Cooks made a proposition that if the Newbys would return to the home farm it should be deeded to them. That having in mind the failure to perform the former agreements, they declined the offer unless the conveyance was made as a condition precedent to their return; that thereupon Mancil G. and Harriett promised and agreed to make such conveyance as such condition precedent, and in pursuance thereof all the parties met on July 20, 1903, and the deed was made; that when made it was delivered and placed in the possession of one Axtell to be held by him (under an agreement of the grantors

and grantees) until the death of Mancil G. and Harriett when it was to be delivered by him to the Newbys and recorded; that Mancil G. and Harriett then and there relinquished all claim or right to said deed or the land, except the right of joint possession of said land with the Newbys; that the consideration of said deed was that the Newbys should keep certain live stock for Mancil G. (describing it) and that the Newbys should remain on the farm and assist Mancil G. and Harriett in maintaining it as a home and that a further consideration was the settlement on Laura A. of her share in the estate of Mancil and Harriett; that thereafter, in consideration of the delivery of said deed, the Newbys returned to the farm and performed valuable services and made valuable improvements; that thereafter said Axtell contemplated removing to Oklahoma; that in this emergency it was agreed by the parties in interest that the deed should be taken from Axtell's possession and placed in the possession temporarily of one Simms, and this was done; that afterwards in July, 1904, by the new agreement of all of the parties in interest the deed was taken out of the hands of Simms, delivered to the Newbys and recorded; that the execution of the deed and its record were the result of mature deliberation on the part of all the parties interested; that the Newbys performed all their obligations under the contract and conveyance. Wherefore, they renewed their prayer to have the court determine the title and rights of the parties and establish title by its decree, etc.

In the fourth count of their answer the third count is referred to and adopted. It next alleges that in August, 1904, plaintiff instituted a suit of like character to the present one, which he dismissed in September of that year voluntarily; that in October of that year he instituted the present suit; that in November following he came to defendants and wanted

the suit settled and stopped so it could never be started again, and offered to sign a contract to that effect if the Newbys would agree to pay him $100 per year in lieu of feeding and caring for certain live stock as contemplated in the first agreement; that said proposition was accepted and a compromise evidenced by a written agreement in the form of a stipulation for a decree in this suit, was signed and executed and filed in court, whereby in addition to the considerations set forth in the stipulation the Newbys agreed to pay plaintiff $100 per year in cash in lieu of feeding and caring for said live stock. The stipulation is set forth in the answer, and defendants tender full compliance with its terms and pray the court to enter a judgment and decree in conformity therewith.

By the fifth count in the answer, the Newbys refer to and adopt the averments of the third and fourth counts and further allege that the land was bought by the separate money and means of Harriett Cook; that she is a necessary party to a determination of the cause, and they ask that an order be made requiring her to be made a party defendant.

Having been made a party, Harriett Cook adopted the answer of her codefendants and prayed the court to ascertain and determine the title of all parties and to establish the same.

The reply was a general denial. It next alleges that plaintiff is very illiterate; that at the time of the stipulation pleaded in the answer, he was in trouble and distress over the litigation and the bad feeling in his family; that these conditions so affected him that he was not able to comprehend the nature of the stipulation, nor its effect, and that he was fraudulently induced by defendants to believe and did believe that it in nowise affected his rights to the real estate; that under this belief he signed the same without any consideration passing; wherefore, he prayed that it be

held for naught, and renewed his prayer for the relief prayed in his petition.

Facts pertaining to any material questions determined will appear in the body of the opinion.

I. Defendants complain that a stipulation for judgment was not specially enforced, *nisi*, by a decree. But the complaint is not sound. One trouble with the stipulation is the answer admits and the proofs show that it did not contain all the compromise agreement. It left out the important feature that the Newbys were to pay $100 per year to plaintiff in lieu of a certain stock arrangement in the original agreement. Another trouble is that although defendants admit plaintiff was entitled to a joint occupation and use of the land during his life, yet the stipulation is without safeguard in that regard. To the contrary, it provides for an out-and-out decree "vesting the fee simple title and all right, title and interest in and to said land into the defendants Laura A. Newby and John H. Newby;" and, further, that the court shall "enter its judgment and decree that neither Mancil G. Cook or Harriett Cook have any right, title and interest in and to said land." Another trouble is that the compromise scheme clearly pointed to a consultation of attorneys on both sides and the drafting of such stipulation as would meet the approval of counsel and effect a just and final settlement of a family imbroglio. There is testimony upon which the court could well find that the stipulation was drawn by defendants' counsel and forwarded by mail to the Newbys; that the plaintiff was illiterate and needed the advice of his counsel; that he did not understand its force and drastic effect and that defendants (because of some prior action taken in the absence of their counsel) unduly hurried its execution in the absence of plaintiff's counsel, though requested

to await a day or so for its examination and approval by them.

The cause was in equity—the stipulation was *executory* in its nature, and, on the record here, we cannot say the chancellor ruled inequitably in refusing to enter a decree in strict accordance with it. The testimony does not warrant a finding that defendants perpetrated a fraud on plaintiff, or misled him as to the legal effect of the paper, as alleged in the reply, but the record discloses such incidents of surprise, accident and mistake connected with its execution as appeal strongly to the conscience of a chancellor in dealing with the property rights of an old man, somewhat illiterate as the plaintiff is shown to be. The decree, when entered, became the chancellor's decree—not that of the litigants. It is the voice of the chancellor's conscience—a conscience that is not plastic mortar to be molded this way and that by the hand of a litigant, however skillful a potter he be. If on the whole case defendants were entitled to relief, that is one thing. But that this stipulation should coerce a decree whether or no, is a different matter. We find no fault with the refusal to specifically perform the stipulation, as such.

The point is ruled against defendants.

II. Defendants' learned counsel somewhat rely for reversal on the fact that the land in question was purchased by the separate means of Harriett Cook. They tendered evidence tending to show that fact. It was excluded, but the offer is here for our consideration. In a nutshell, the argument runs somewhat in this wise, viz.: The "moral and meritorious" consideration for the family settlement and conveyance flowed from Harriett and not from Mancil. Now, Harriett has joined hands with defendants in upholding the deed and the record of it, therefore, her wishes should be subserved.

But this view is more sentimental than controll-

ing. Because: The land was bought prior to the enactment of the married women's enabling acts. Conceding it was bought with money coming to the wife by inheritance, yet on this record such money was reduced to the possession of the husband with the approval and acquiescence of the wife. The title was taken in the husband with her knowledge and remained there with her consent. Moreover, the Newbys were willing enough to take his title through a deed conveying it and conveying merely an inchoate dower interest by Harriett. There is no fact in the case tending to show that such deed was made because Harriett was the beneficial owner of the land. To the contrary, it was negotiated for and made on the theory that the land belonged to Mancil. In this condition of things, to hark back to the origin of the estate and discuss the elements entering into that, tends only to confuse the real issues. When asked by plaintiff to return his title, the Newbys may not claim to take under the deed and at the same time mend their hold on the land by denying plaintiff's original title. The two theories are inconsistent. We conclude that the injected theory has no office beyond that of coloring matter. The Newbys must stand or fall on the theory upon which they dealt with plaintiff, to-wit, the theory that the land belonged to him and was conveyed to them by a delivered deed. If they want to invoke or stand on an equitable title in Harriett, let them first put Mancil *in statu quo ante.*

The point is ruled against defendants.

III. Complaint is made that the learned chancellor used language, *nisi,* indicating inequitable haste in the hearing and disposition of the cause. It is suggested the decree is the product of such haste; but such matter is wholly afield. The chancellor made remarks indicating he wanted the hearing to move on—that his judicial spirit ("the stomach of his sense") was a

trifle disgruntled over tedious examinations of witnesses, the lugging in of extraneous issues; but it must be remembered there was no jury present to take color from his words; and, after all, his remarks at root were *con amore*. And, finally, we are not concerned with questions relating to either his patience or impatience. The vital question here is: Does his decree, in the light of the facts, do equity? That is the touchstone on appeal.

IV. The main question relates to the delivery of the deed and that question seeks facts.

Mancil and Harriett Cook had six children and a modest estate. Old age coming on, they started three of their sons with advancements in land. Two of their children died in infancy: Laura A. was the only one at home, and to her no advancement had been made. The testimony conclusively shows that when she married Newby her parents desired the young people to remain on the home place and take charge of it and help care for them. It shows conclusively, furthermore, that it was their settled intention that Laura should have the home place as her share when they died. True, it was of greater value than the advancements severally made to the sons, but not so much so as to challenge comment in the light of- the arrangement made. Verbal arrangements somewhat looking to the end in view were made, but not reduced to writing and were broken. Finally the young couple went to themselves a distance away on a dairy farm near Cameron and were brought back by plaintiff and his wife under a promise to convey the land to them. This promise was made in a letter written by the mother, and offered in evidence but excluded. Defendants put in testimony showing it was written at the request of plaintiff and with his knowledge. He who does a thing by another, does it himself. We think it should have been admitted as the promise of

both parents and as a fact throwing light on the final arrangement. Its terms are before us for what they are worth. That letter, under date of June 26, 1901, runs as follows:

"Dear Children: I will write you again this evening. We are only tolerable well. It is so dry and hot, nobody feels well. It has not rained yet to do any good. I don't know whether we will raise anything, or not. It is looking doubtful. Laura, Mance and me want you to come home and we will give you the place. It is more than the boys got, but we expect to live with you. The boys never had any care of us, and we don't know what trouble we may be. If you will do this, write and let us know as soon as you can. We are anxious to know. By-by for this time."

Having returned to the farm and performed labor and undertaken betterments in pursuance of that promise, presently plaintiff refused to enter into writings to effectuate the promise and, in consequence, the Newbys again moved away and took another farm. The upshot of it all was that there fell a time when the broken threads of the old negotiations were taken up anew by plaintiff with the purpose of getting the Newbys to return and take charge of the farm, live with him and his wife and maintain the home. An offer was made to make a will leaving the real estate to Laura A. Newby and her bodily heirs. As no children were born of the marriage, she thought such an arrangement unjust to her husband and declined it. The Newbys let it be known, in effect, that unless arrangements could be put into writing, they would not return but would make their own way in the world. Such being the condition of things, it was finally agreed that a deed be made as a condition precedent to the return of the Newbys. With this end in view, all the parties met by arrangement and an ordinary warranty deed was drawn by one Axtell, and signed and acknowl-

edged by Mancil G. and Harriett, conveying the 120 acres of land constituting the home place of the Cooks (and all the land they had) to Laura A. and John H. Newby. It was left with the scrivener, who as a notary took the acknowledgment, with the following memorandum signed by the grantors:

"McFall, Mo., July 20, 1903.

"We hereby authorize O. A. Axtell to hold a deed this day made by us of our home farm to Laura A. Newby & her husband during our lifetime and at our death to cause said deed to be recorded and to then deliver it to them and we relinquish all right and title to said farm excepting possession and use during our lifetime.            MANCIL G. COOK.
            HARRIETT COOK."

There was present in Axtell's office at the time (besides Axtell, the Newbys and Cooks) several witnesses. We need not give the testimony in detail. The clear weight of it is to the effect indicated in the written memorandum, to-wit, that the title passed and that the grantors gave up all right thereafter to recall the deed—that the matter was fixed permanently. Mr. Axtell's testimony is somewhat to the contrary, but when we consider the very object of making the deed as an inducement for the return of the young people to take charge of the farm, keeping in view prior abortive attempts and broken promises to execute writings, and when we consider the testimony of the grantors and grantees and that of the other witnesses present, and when we give due weight to the signed memorandum, we are forced to the foregoing conclusion.

Subsequently, and before the Newbys moved on the land, Axtell was about to change his domicile to Oklahoma. All parties desired the deed should not be taken away. Accordingly, it was settled by family arrangement that it should be moved to a bank and

deposited with a banker, Mr. Simms; and in pursuance of that arrangement it was taken from Axtell by John Newby and Harriett Cook with the consent of plaintiff and deposited with Mr. Simms.

The testimony shows that afterwards the Newbys in pursuance of the family settlement moved to the farm and commenced and continued performance of the contract.

The cause was not tried below on the theory the consideration for the deed had failed in that the Newbys had not complied with their agreement, which was, in substance, to return to the farm, take charge of it, make a home for Mancil and Harriett, keep certain stock for Mancil and share and divide the profits of farming operations. To the contrary, the court inquired of plaintiff's learned counsel as follows: "On what do you found your complaint to have the deed set aside?" To this Mr. Dalbey, of counsel for plaintiff, replied: "Simply that it was obtained without his consent and placed of record—fraudulently obtained." Again, when a line of inquiry was being pursued relating to the treatment given by the Newbys to the plaintiff an objection was raised that it was not within the issues on the pleadings, and the following occurred: "(By Judge Goodman, counsel for plaintiff): We haven't made it an issue and we don't expect to. The issue here is the clandestine getting that deed and putting it on record."

At a certain time in the summer of 1904 this deed was brought home by Harriett Cook and Mrs. Newby, remained in the house for awhile and was then put on record. There was testimony upon which the chancellor could find either way on the issue as to whether its removal from the custody of Simms and subsequent record were with the knowledge and consent of plaintiff. Harriett and the Newbys testified it was brought home as the result of an agreement with plaintiff and was

recorded at his suggestion. They say that plaintiff suggested the deed might as well be recorded as to lie in the possession of Simms—that the place for a deed was on record. Harriett testified that she and her husband saw the deed after it was brought home. Plaintiff does not agree to this. He denies seeing the deed in the house—denies that he consented it should be taken from the custody of Simms or put on record. In corroboration of his theory, it is shown that he went to the bank to get the deed himself from Simms sometime later. As tending to impeach the testimony of the Newbys by showing that their motive in getting the deed was to keep plaintiff from getting it, plaintiff put upon the stand two witnesses named Mason, husband and wife. Mr. Mason was on the stand and for two pages of printed questions and answers he showed such lack of memory and information that the court, at the end of it, directed plaintiff's counsel to "call another witness." Thereupon, under such spur and as a last attempt to get an *atom* of testimony, counsel plumply asked: "Q. We have another question I would like to ask. To refresh your memory, did they (the Newbys) not tell you that they went to the McFall bank to get that deed to keep the plaintiff, Mr. Cook, from getting it?" This question was objected to as leading and suggestive and because the witness had already testified he didn't know. The court allowed the question, and his answer was this: "Well, sir, I have a recollection of them telling me those words —*something to that effect—something near like that. . . . Yes, sir, but what it was, why, I don't remember.*"

Mrs. Mason testified that in harvest time, 1904, the Newbys showed her the deed. She couldn't say what they said; she didn't know how the subject came up; witness said in substance that she would like to

see if the deed was like their deeds; she looked it over with the remark that it was like theirs and gave it back to Mrs. Newby. Then the following occurred: "Did they state where they got that deed? A. No, sir, I don't know that they did. Q. Did they make any statement of how or why they came in possession of it? A. They were afraid Mr. Cook would go and get it.. Q. Where did they get it from did they say? A. Out of the bank." On cross-examination, she said she could not remember all the conversation; that some of it might have slipped her mind; that she didn't pay any particular attention to what was said.

There was evidence that the Newbys were paying the taxes on the land. It was assessed to plaintiff in the year 1903. Plaintiff's assessment list for 1904 showed that he made an affidavit to the effect that he was not the owner of any real estate.

On this record, can the decree cancelling the deed stand?

We think not. The broad justice of the case on the facts present leads to that conclusion. The making of the deed was not of sudden whim or a passing emotion of parental love. The deed was not laid away, as on a shelf, as a mere scroll to take time to consider. It was a business arrangement understandingly entered into as the result of business negotiation and supported by a consideration. [Halsa v. Halsa, 8 Mo. 303.] The avowed object of it was to put the matter beyond the caprice of plaintiff—a caprice which grantees had theretofore suffered from. While Mancil could read and write poorly, yet there is no proof here he was *non sui juris*. There is no allegation in the bill that this deed was void because of imposition on a grantor of weak mind.

A deed speaks only by delivery, and what constitutes delivery is frequently a close question. It is a question of intent—a mixed question of law and fact.

The intent of the parties may be got at by what happened before and at the time and, it has been said, it may be that what happens afterwards is of value. When a deed, signed and acknowledged, is placed in the custody of a third person to hold for the benefit of the grantee, as here, with the intent of parting with dominion over it, that makes a good delivery in the eye of the law if the grantee accepts the deed. The facts of this case irresistibly tend to the conclusion that what Mancil G. and Harriett Cook did was done to create the reliance on the part of the grantees that the conveyance was irrevocable, and, in this case, that reliance was created and acted on.

In commenting on a case (Williams v. Latham, 113 Mo. l. c. 174), BRACE, J., said: "But, conceding that it was the intention of Mrs. Smith that the deeds were not to be delivered by Mrs. Thompson or recorded until after her death, and that Mrs. Thompson was cognizant of that intention, yet the delivery was good. It was absolute; the contingency upon which the second delivery was to take place was certain to happen, all the power and dominion of the grantor over the instrument was relinquished without reservation to Mrs. Thompson. The intention to pass title as a present transfer is evident upon the face of the whole transaction and placed beyond doubt by the grantor's reservation of the possession and rents for her life, put in the deeds after they were drawn, on her own suggestion. Such being the case, from the moment the deed was delivered to Mrs. Thompson she became a trustee, holding the instrument for the benefit of the grantee, and, when she discharged the trust, by afterwards delivering the deed to the defendant (although after the death of Mrs. Smith), yet such second delivery hath relation to the time of the first, and is good delivery in the lifetime of Mrs. Smith. The ruling of the circuit court so holding is sustained by the rul-

ings of this court in the following cases and authorities cited: Rothenbarger v. Rothenbarger, 111 Mo. 1; Allen v. DeGroodt, 105 Mo. 442; Sneathen v. Sneathen, 104 Mo. 201; Crowder v. Searcy, 103 Mo. 97; Standiford v. Standiford, 97 Mo. 231; Burke v. Adams, 80 Mo. 504; Huey v. Huey, 65 Mo. 689.''

In Foreman v. Archer, 130 Ia. l. c. 55, WEAVER, J., speaking to the point, said: ''A deed placed by the grantor in the hands of a third person with unconditional instructions to deliver to the grantee upon the death of the grantor, and without any reservation in the grantor of the right to revoke or recall the instrument during his lifetime, operates to vest the grantee with a present interest in the land, which the grantor cannot thereafter recall or destroy by the simple expedient of retaking possession of the deed.'' The learned judge cites a line of Iowa cases to sustain the proposition advanced, as well as cases from other jurisdictions, viz.: Foster v. Mansfield, 3 Metc. 412; Bury v. Young, 98 Cal. 446; Prutsman v. Baker, 30 Wis. 644; Hathaway v. Payne, 34 N. Y. 106; Concord Bank v. Bellis, 10 Cush. 278; Wheelwright v. Wheelwright, 2 Mass. 454; Thatcher v. St. Andrew's Church, 37 Mich. 264; Wall v. Wall, 30 Miss. 91. Continuing, he says: ''Such a deed, delivered to a third person to be turned over to the grantee after the grantor's death, is usually held to operate as an ordinary conveyance of the fee, subject to a life estate reserved in the grantor,'' citing White v. Watts, 118 Ia. 549; Prutsman v. Baker, *supra;* Bury v. Young, *supra*— which cases sustain the proposition.

In Prutsman v. Baker, *supra,* DIXON, C. J., said of a like hypothesis: ''As to the grantor, the delivery is absolute and final, and so is his conveyance of the land, the title to which passes at once to the grantee, qualified only by the right of the grantor to use and occupy or take and receive the rents and profits dur-

ing his life, or until the event shall have happened upon which second delivery is to be made. The grantor in such case converts his estate into a life tenancy, and makes himself the tenant of the grantee. These conclusions result unavoidably from the certainty of the event upon which the second delivery is made to depend, and from the impossibility, under the circumstances, that the grantor will ever be able to recall or repossess himself of the deed. He delivers the writing, therefore, *as his deed,* always so to remain and never to return to him, and it becomes presently operative and the title vests immediately in the grantee.''

V. Assuming, then, for the purposes of the case, as held in the last paragraph, that the deed was not in escrow, but was (without power of recall) placed with Axtell for the benefit of the grantees to be recorded on the death of the grantors, the contemporaneously signed memorandum but makes clear that a life tenancy was created in the grantors, which the law itself would predicate of that condition of things. This memorandum was part and parcel of the transaction. It should, therefore, be read into the deed. The arrangement entered into, shown by the record, upon which the parties put their own construction at the time, qualifies the life possession of grantors by adding thereto the right of joint occupancy on the part of grantees.

We do not consider the record of the deed, whether made with plaintiff's consent or not, a material element in the equities of the case. If the title passed from plaintiff (as we have held) he would suffer no injury from a mere record which may have been a breach of trust but in nowise affected the title. [Wallace v. Harris, 32 Mich. 380.] That fraud to be actionable must result in injury is axiomatic.

VI. We now come to a phase of the case, eyed at first a little askance, and then critically. Whatever value it has is in showing how one taper lights another in briefs, as in the world at large. It shows, too, how difficult in a close matter it is to determine the proximate cause of things—or the probable result of a given cause. Possibly, its force is somewhat spent in disclosing what hidden pitfalls lurk in the primrose paths diverging from the beaten way in brief-making for appellate courts. As wayfarers in the main-traveled highway of the law, we shall set it down to point its own moral, thus:

Appellants' scholarly counsel close a good brief in chief with a short and modest flight of fancy—a borrowed apostrophe to Justice—by poetical license, dressed in singular phrase, viz.:

"For Justice
All place a temple, and all season summer."

Now, *prima facie,* is this aught but an innocent and mild invocation to serenity of judicial temper? Is it more than a wholesome effort to key up the mind of the court to a notch of high thinking? Inquiring students in the law recall the unexpected and anxious result produced by throwing the squib in the celebrated Squib Case. But mark the novel result here. The very innocency of the apostrophe's face was taken as a mask hiding evil contrivances. So it was that the very blandness of the countenance of Mr. Harte's "Heathen Chinee" [in the case of William Nye] hid like evil. Apparently nettled by its use, learned counsel for respondent condemn appellants' brief by and large. Bethinking themselves of the time when Iago tripped good Michael Cassio into mischief by a night's revel, they designate the brief in Cassio's description of the events of that woeful night, as, viz.:

"A mass of things . . . but nothing wherefore."

Not only so, but counsel fall upon the (to us) unknown author of the apostrophe with heated epithet. They belabor him roundly, though dead. They say he was the "great agnostic and prince of plagiarists." They say the first part of the apostrophe was "cribbed from a heathen poet" without giving due credit. They say its concluding phrase is of such "occult meaning that no one so far as our knowledge extends has had the hardihood to asseverate that it is within his ken." They conclude a trenchant and sprightly printed argument with a beautiful poetical apostrophe to the Bible, most becoming and tenderly reverential, and then (by way of sharp contrast) darkly hint that appellants' apostrophe comes from a sinister source, to-wit, Paine, Volney or Voltaire—winding up by laying down certain sacred ethical precepts, which, they insist, announce the right doctrine to apply to the facts of the record.

Thus sorely pricked, appellants' counsel (drawing from the well of the drama) retort in their reply brief in the words of Bassanio's comment on the caskets (made to himself, see, Merchant of Venice, Act III., sc. 2), viz.:

"In law, what plea so tainted and corrupt,
But, being seasoned with a gracious voice,
Obscures the show of evil?   In religion,
What damned error but some sober brow
Will bless it, and approve it with a text,
Hiding the grossness with fair ornament."

So much, for the matter. We take leave of it with this observation: Whatever the issue raised, it is not one of fact or law. We refuse to meddle with it on this appeal and, hence, leave it to a forum, if any, having jurisdiction to try it out.

VII. Defendants by their answer having asked the court to ascertain and determine the title of the respective parties, and sufficient facts for the deter-

mination of such titles being in the record, the cause is reversed and remanded with directions to the chancellor, *nisi,* to enter a decree determining the title of Mancil G. and Harriett Cook to be a life tenancy with the right to joint possession of the land with Laura A. and John H. Newby, and that the fee (subject to the life estate) is in the said John H. and Laura A. Newby as husband and wife. The chancellor must further decree that nothing in his decree shall prejudice any right of Mancil G. or Harriett Cook or either of them to sue to set aside or modify the conveyance on equitable terms if hereafter the consideration for the deed should fail through subsequent wrongful or negligent acts of the Newbys in complying with their contract. We do not hold such right can exist—that question is not here. We say the right must be preserved if it does spring into existence.

All concur except *Valliant, P. J.,* absent.