## W. C. NANCE, Appellant, v. J. P. KEARBEY.

### In Banc, June 28, 1913.

1. **SUFFRAGE: Constitutional Right: Irregular Exercise.** A constitutional right to vote may not be so regulated by statute as to be entirely abrogated or lightly denied. Election laws must be liberally construed in aid of the right; and a failure to observe a statutory regulation will not be fatal to the right unless the statute makes it fatal.

2. ————: **Disfranchised Because of Error of Clerk.** To permit a great mass of voters to be disfranchised because of an irregularity in the printing of the ballots, whether the result of design or inadvertence, would be to turn the law into an indefensible trap, and to greatly multiply the powers of election officials to control the results of an election.

3. **ELECTION: Irregularity in Ballots: Challenge After Election.** Whether a ticket nominated by an electors' petition can be printed with the party's name as a caption or whether it must appear with the words "nominated by electors," a challenge of the ticket for any such irregularity comes too late after election, in which there was no fraud of any sort. The statute provides a method of challenging the ballots for such irregularity before election, and if it is not done then the irregularity will not be permitted to change the result of an honest count after the election.

Appeal from Butler Circuit Court.—*Hon. John P. Foard,* Judge.

AFFIRMED

*Lew R. Thomason, Abington & Phillips* and *E. A. Green* for appellant.

(1) Candidates nominated by electors are not the nominees of a political party; but are the nominees of the individual electors nominating them, and only as such are they entitled to go upon the ballot. The names of candidates, nominated by electors, cannot be placed upon the regular ticket of any political party although there be a vacancy upon the ticket of the party of which they are members. Atkeson v. Lay,

115 Mo. 538; Whipple v. Owen, 24 Colo. 319; Phillips·
v. Curtis, 4 Idaho, 193; Lowery v. Davis, 101 Iowa,.
236; Fisher v. Dudley, 74 Md. 242. Even though all the·
electors signing the petition belong to the same politi-
cal party, the candidate so nominated is not the candi-
date of that party, for in signing the petition they are·
acting in their individual capacity, and not in a repre--
sentative capacity as representatives of their party..
State ex rel. v. Rotwitt, 18 Mont. 502; Atkeson v. Lay,
115 Mo. 538. It should not be contended that the re-
spondent was nominated by any other method than
at the primary election held in August, 1912, as the
candidate of the Republican party, by virtue of which
his name was placed upon the official ballot as the
candidate of that party, for the office of sheriff of
Butler county, Missouri; and by the petition signed
by electors, filed with the clerk of the county court
October 3, 1912, which only authorized that official to
place the name of respondent upon the ballot under an
appropriate heading, as having been duly nominated
by electors, and the placing of respondent's name
upon the official ballot of the Progressive party, as the
candidate of that party, without ever having been
nominated by that party, was illegal. Atkeson v. Lay,
115 Mo. 555; State ex rel. v. Rotwitt, 18 Mont. 502;
Phillips v. Curtis, 4 Idaho, 193. The placing, by the
use of a rubber stamp, of a candidate's name upon the
ballot, when his name had been properly omitted from
the ballot, because no certificate of his nomination
had been filed with the clerk of the county court, ren-
dered the ballot an illegal one, and the votes cast
thereon not entitled to be counted. Rollins v. McKin-
ney, 157 Mo. 656.

*David W. Hill, Albert Chandler, John M. Atkin-
son* and *Arthur V. Lashley* for respondent.

(1) A candidate's name may appear upon two
tickets. Williams v. Dalrymple, 132 Mo. 62; Shields

v. McGregor, 91 Mo. 543; State ex inf. v. Bland, 144 Mo. 552. (2) Objections to a nomination, or to the form of the official ballot, are of two kinds: Within the party; or outside the party, The orthodoxy of a nominee can usually be questioned only by a member of the party. One outside the party can object only when, and so far as, the statute authorizes—it not being a common law right or remedy; either objection is waived unless made pursuant to Sec. 5849, R. S. 1909, within three days prior to the election. Bowers v. Smith, 111 Mo. 45; Atkeson v. Lay, 115 Mo. 538; Williams v. Dalrymple, 132 Mo. 62; Evans v. Gass, 244 Mo. 329. (3) The laws of Missouri favor the exercise of the suffrage, and as a part of that right, the power of new parties to organize and make nominations, informally prior to their final establishment. State ex rel. v. Kortjohn, 246 Mo. 34; Williams v. Dalrymple, 132 Mo. 62. (4) Any other position than that stated in point 3 would be unconstitutional. In re Callahan, 200 N. Y. 59 (holding antifusion statute similar to Sec. 5848, R. S. 1909, unconstitutional); State v. O'Leary, 43 Mont. 157; Morrow v. Wipf, 115 N. W. 1121; Davidson v. Hansen, 87 Minn. 211; Schaefer v. Whipple, 25 Colo. 400; State ex rel. v. Phelps, 144 Wis. 1; People v. Election Commrs., 221 Ill. 9; Britton v. Election Commrs., 129 Cal. 337; State v. Felton, 77 Ohio St. 569; Ex parte Wilson, 125 Pac. 744. (5) Objection to the form or printing of ballots must be made under Sec. 5896, R. S. 1909.

LAMM, C. J.—At the general election in November, 1912, Mr. Kearbey received eleven more votes than Mr. Nance for the office of sheriff of Butler county. On a canvass of the returns such result was promulgated, the county clerk so certified, a formal certificate of election followed, with the Governor's commission attested by the Great Seal, and the superscription of the Secretary of State.

In due time Mr. Nance contested the election by notice (R. S. 1909, sec. 5924) returnable to the January term, 1913, of the Butler Circuit Court. Cast on a trial on the merits, he appealed, and the cause, advanced under Revised Statutes 1909, section 5960, was submitted on briefs and oral argument at our April term.

A retrospective glance over the course election contests have run in this court shows the case stands aloof and solitary; for, observe, the pleadings and agreed statement of facts are such that no recount of votes was necessary. So, it is confessed that no votes but honest ones were cast or counted and that they were honestly counted as cast. So, the trial below proceeded on the concession in open court that there was no fraud on the part of electors, election officers or the county clerk, nor were there any fatal irregularities in the poll book returns or mistakes in casting up the vote. The case is singular in this: the grounds of contest relate solely to alleged *nomination* and other pre-election irregularities, and not at all to election irregularities.

A bit of current historical matter is not amiss, thus:

Early in October, 1912, a proceeding by mandamus was begun in this court by Punch and Wilson to compel the board of election commissioners of St. Louis to print their names upon the official ballot as candidates of the Progressive party for certain offices. On a return made to our alternative writ to show cause, that case was argued and submitted and on October 16, 1912, we awarded a permanent writ. Our conclusions, announced at first orally, were that the names of relators, Punch and Wilson, were entitled to go on the official ballot as the candidates of the Progressive party for the designated offices for two reasons, namely: (a) because of a nomination by petition of electors affiliating with that party (and desig-

:nating "Progressive party" as their party name), a party newly born since the August primary, and (b) because of nominations by the newly formed *de facto* party committee of that party acting *bona fide*. On that oral pronouncement, it was adjudged that a permanent writ issue, as said, and on November 26, 1912, our opinion followed. [State ex rel. v. Kortjohn et al., 246 Mo. 34—*q. v.*] The unanimous opinion of the six sitting members of this court, speaking through Brother GRAVES, strictly followed the terms of our prior pronouncement. The purpose of deciding that case before an opinion could be formulated and handed down was to perform a sensible judicial function in settling complications and vexed questions then pending in various counties in the State and before State officers from the fact that a new party had sprung up—a party that with vigor was stoutly asserting a right to put state and county tickets in the field for the ensuing general election.

(*Note*: A (deservedly) obscure rhymester whose verses will be remembered when Virgil is forgotten— *and not till then*—in a homely touch or so, in the role of *amicus curiae* may be, outlined the appealing situation in that case to this court in this way:

"Are Your Honors of a mind now
That we all be left behind now?
That we all can have no ticket,
Have been caught in legal thicket,
And are lost in legal brambles,
While the train we want to get on
Rolls out straight for Armageddon?"

The curious may consult, with more or less profit, Rev. xvi:16; and 2 Chron. xxxv:22 on *Armageddon* and its related term, *Megiddo,* where a dim war once raged, used as a prototype in oratory in the year 1912.)

Our judgment had the effect, doubtless, to clarify a confused situation by construing our election laws on a disturbing point, up to that time *res nova*. On the strength of the ruling in the Punch-Kortjohn case a Progressive party ticket was put out and voted in a very great majority, if not in all, of the counties in Missouri.

So much for facts of current history (all of which we saw and some of which we were).

Coming to the concrete case, in Butler county there was in apt time presented to the county clerk and filed in his office a petition of qualified electors, duly certified, bearing the names of the statutory percentage of voters, nominating a Progressive party county ticket for that county for the ensuing general election, and so designating its nominees and party name. On the ticket proposed in that petition Mr. Kearbey's name appeared as nominee for the office of sheriff. No objection was made below or is made here to its form, sufficiency or certification. When our decision in the Kortjohn case was announced, the county clerk, as we understand this record, published that list of named candidates as and for the Progressive ticket for Butler county; and the same was presently printed under the auspices of the county court as the official ballot for the Progressive party in connection with nominations by the same party certified to the county clerk by the Secretary of State for state and judicial officers.

No objections or exceptions were filed with the county clerk and no ante-election steps were taken in any court or before any judge to correct the *caption* of the ticket, or its *body,* in any respect or in any wise to challenge the acts or method of the county clerk in that behalf. The tickets so printed and published, bearing the names of candidates so nominated, were sent out in due official channels and 408 of them were voted

at that election by electors of that party and duly canvassed.

It seems Mr. Kearbey had also been nominated at the prior August primary as the Republican candidate for the office of sheriff, so his name accordingly appeared on the official Republican ballot as such candidate. His dual attitude toward these nominations was that of a man smelling at two roses at one and the same whiff. His attitude was *not* that of the party in the Beggar's Opera, to-wit: "How happy could I be with either, were t'other dear charmer away." At the same primary, Mr. Nance was nominated as the Democratic candidate for sheriff and his name appeared on the official Democratic ticket. It also appears there was a Progressive party committee in Butler county, formed, we presume, in the old fashioned way, said in the Punch-Kortjohn case to be permissible at the birth of a new party. It kept minutes of its proceedings, now destroyed by fire. There was evidence tending to show that such committee adopted or suggested the plan of circulating that petition among its electors to nominate, as candidates for county officers, the several gentlemen named therein for the respective offices and the nominating petition was fathered and sprang into existence that way. It was signed by all the members of the committee who could be readily reached (but not officially), together with a sufficient number of other electors, and was duly and in apt time filed with the county clerk as said. We lay no stress on the mentioned supervision by the committee.

Contestant contends, as we understand his counsel, that the nominating petition was well enough as far as it went, but that the grouping or heading of the ticket as printed by the county clerk was imperfect or irregular in that it did not indicate the nominations were made by electors. In other words, that the Progressive party, as a party, could not nominate a

ticket by electors and have it appear under that party
caption, but must nominate at a primary or by its
party committee or possibly by a convention of dele-
gates, or else the ticket should show a nomination by
electors. It may be we are in error in the assigned
specifications of the views of contestant's counsel, but
there can be no mistake about the ultimate contention,
viz., that the method adopted by the county clerk in
grouping the candidates and printing the Progressive
ticket was irregular, and that such ticket (under the
caption given it) had no legal place on the official bal-
lot; hence those ballots were affected by an incurable
vice. It stands conceded that it took the combined vote
of electors voting both the Progressive and Republican
tickets to elect Mr. Kearbey. Contestant asks us to
hold that the Progressive ballots were so much waste
paper, and that the 408 votes cast by that party should
be rejected *en masse.*

Contestant does not contend that Mr. Kearbey had
not the legal right to have his name on both Republican
and Progressive tickets. In the state of the law in
1912 he could not with propriety make that contention.
[Williams v. Dalrymple, 132 Mo. 62.]

A determination of the case may be approached
from either of two angles, both within the contentions
in briefs, thus:

In the first place, it might be determined from the
standpoint of the legality *vel non* of such plan of mak-
ing Progressive party nominations by a petition of
electors and the printing of tickets headed as were
these.

In the second place, it might be determined by con-
sidering whether (absent a pre-election challenge, as
here) *in an election contest* an official ballot, published,
printed and voted, as was this, can be challenged (ab-
sent fraud in the election and absent any fatal irregu-
larity in election officers in handling the ballots)—chal-
lenged and those who voted it disfranchised, merely

because of alleged imperfections or errors in judgment of the county clerk in printing the ballot, including its caption.

In our opinion, on the facts of this case, the points discussed by counsel will be fully determined by a consideration of the last proposition. We are further of the opinion that they must be ruled against contestant, because:

(a) It is right well in setting out to remind ourselves of some fundamentals, viz.: While the right to vote is not a vested, natural right in a strict sense, yet it is a constitutional right in those citizens possessed of enumerated constitutional qualifications. [Constitution, art. 8, sec. 2.] It may be regulated by statute but not lightly denied or abrogated. [Gass v. Evans, 244 Mo. l. c. 350; Bowers v. Smith, 111 Mo. l. c. 55.] "No power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." [Constitution, art. 2, sec. 9.] So jealous is the law in that behalf that voters are privileged from arrest at, or going to or coming from, the polls except for treason, felony, or breach of the peace. [Constitution, art. 8, sec. 4.] So, the subject-matter is tender; for a sheriff is one of the few county officers of constitutional dignity (Constitution, art 9, sec. 10), and since the days of Alfred the Great the office of sheriff has been one of which the people have been sharply solicitous because of its great power in affairs pertaining to the common weal. The sheriff was the keeper of the King's peace, the first man in the county and superior in rank to any nobleman in the county. He apprehended and committed to prison. At the common law he could bind over to keep the peace. He was bound to pursue and take all traitors, murderers, felons and other misdoers and commit them to jail for safe custody. He defended his county against the King's enemies and for that purpose and to keep the peace and pursue felons, he

*Suffrage.*

could summon a *posse comitatus,* and, maybe, raise the hue and cry. He executed all process from the King's courts of justice, summoned juries and executed the sentence of the court, though it extended to death it- self. [1 Blackstone's Com. (Lewis's Ed.), pp. 342-4.]

A Missouri sheriff is now, as at common law, the chief citizen of the county and many of his common law duties attend his office. He is defined to be an officer who represents the executive or administrative power of the State within his county. [25 Am. & Eng. Ency. of Law (2 Ed.), 662.] Agreeable thereto are many statutes, e. g., Revised Statutes 1909, sections 11210 and 11212.

The very taproot and reason for any election at all among a free people, is that the majority may rule; hence there are two main settled and uniform rules of interpretation, thus:

*First*: Election laws must be liberally construed in aid of the right of suffrage. [State ex rel. v. Hough, 193 Mo. l. c. 651; Hale v. Stimson, 198 Mo. 134.] The **Election: Irregularity.** whole tendency of American authority is towards liberality to the end of sustain- ing the honest choice of electors. [Stack- pole v. Hallahan, 16 Mont. 40.] The choice of electors must be judicially respected, unless their voice is made to speak a lie, or a result radically vicious. because of a disregard of mandatory statutory safeguards.

*Second*: The uppermost question in applying stat- utory regulation to determine the legality of votes cast and counted is whether or not the statute itself makes a specified irregularity fatal. If so, courts enforce it to the letter. If not, courts will not be astute to make it fatal by judicial construction. [Gass v. Evans, 244 Mo. l. c. 353; Hehl v. Guion, 155 Mo. 76.] "Such a construction" (says this court, speaking through BAR- CLAY, J., in Bowers v. Smith, 111 Mo. l. c. 55) " of a law as would permit the disfranchisement of large bod- ies of voters, because of an error of a single official.

should never be adopted where the language in question is fairly susceptible of any other. [Wells v. Stanforth (1885), 16 Q. B. Div. 245.]'' Again (pp. 61-2): ''If the law itself declares a specified irregularity to be fatal, the courts will follow that command irrespective of their views of the importance of the requirement. [Ledbetter v. Hall (1876), 62 Mo. 422.] In the absence of such declaration, the judiciary endeavor as best they may to discern whether the deviation from the prescribed forms of law had or had not so vital an influence on the proceedings as probably prevented a free and full expression of the popular will. If it had, the irregularity is held to vitiate the entire return; otherwise it is considered immaterial.''

(b)    The Australian ballot law in force in this State for a generation, for the first time took away from a political party and electors the right to print, circulate, handle and vote their own ballot, and gave the preclusive right and made it the preclusive duty of the county clerk to print an official one. This official ballot passes through strictly official channels to election officers, thence to the hands of the Irregularity voter for an instant only when in the act Prior to Election. of exercising the right to vote, from thence it goes back to the election officers to be numbered, deposited, counted or rejected. From thence onward such cast ballot remains in official custody inviolate and secret except it be produced for purposes prescribed by the law. The voter from beginning to end had nothing to do with it except he could erase a name and substitute another in the voting booth, that is, he has left him a natural right to scratch (out or in). We should expect, therefore, in such a statutory scheme, *ex necessitate rei,* a pre-election plan for correcting official errors of judgment causing imperfections or irregularities in ballots so officially promulgated. So long as political parties or electors prepared their own ballots, the fault or blame for irreg-

ularities rested with them. But when the government took over that function, such fault and blame rested with officials. It is obvious that any election law permitting officials, either by design or inadvertence, to print irregular official ballots and foist them on voters and thereby disfranchise them by wholesale without their own fault, *nolens volens,* would be a harsh and indefensible statute. It would make of the law a gigantic trap to catch the unwary voter by the heel. The remedy provided by such statute would be worse than the disease it was intended to cure in the body politic. Nay, the unclean spirit, ostensibly cast out, walking through dry places, seeking rest and finding none, would return with seven other spirits more wicked than himself and finding rooms all swept and garnished would enter in and dwell there, so that the last state of the law would be worse than the first. [Luke xi: 24-26.] "It must be borne in mind" says BLAKE, V. C., in Grant v. McCallum, 12 Can. L. J. (N. S.) l. c. 114, "that if the court lightly interferes with elections on account of errors of the officers employed in their conduct, a very large power may thus be placed in the hands of these men. That which arises from carelessness to-day may be from a corrupt motive tomorrow, and thus the officer is enabled, by some trivial act or omission, to serve some sinister purpose, and to have an election avoided, and at the same time to run but little chance of the fraudulent intent being proved against him."

The dangers pointed to by the vice chancellor are held by this court of stiff significance. [Hehl v. Guion, 155 Mo. 76; Gass v. Evans, 244 Mo. l. c. 354.]

The Australian ballot law, a reform act, was not built on such disturbing and indefensible lines. *Contra,* it provided plans and contemplated proceedings to correct irregularities in ballots before election in order that a timely remedy might be applied before the

event, that is, before it was too late. Witness two statutes: One, section 5849, reads in part as follows:

"All certificates of nomination which are in apparent conformity with the provisions of section 5848 and 5849, shall be deemed to be valid unless objection thereto shall be duly made, in writing, within three days after the filing of the same. In case such objection is made, notice thereof shall forthwith be mailed to all candidates who may be affected thereby, addressed to them at their respective places of residence as given in the certificate of nomination. Objections to use of party name may also be made and passed upon in the same manner as objections to certificates. The Secretary of State or the county clerk, as the case may be, with whom the original certificate was filed, shall in the first instance pass upon the validity of such objection and his decision shall be final, unless an order shall be made in the matter by the Supreme Court, or a circuit court, or by a judge of such court in vacation, before the date for the certification of the names of nominees by the Secretary of State to the county clerk, or before the time at which the county clerk is required by law to publish the names of nominees as certified to him. Such order may be made summarily upon application of any party interested, and upon such notice as the court or judge may require," etc.

The other, section 5896, reads:

"Whenever it shall appear by affidavit that an error or omission has occurred in the publication of the names or description of candidates nominated for office, or in the printing of the ballots, the circuit court of any county, or the judge thereof in vacation, or if the circuit judge is then absent from the county, a judge of the county court, may, upon application by any elector, by order, require the clerk of the county court to correct such error, or to show cause why such error should not be corrected."

In the Bowers-Smith case, in addition to other grounds of contest, there was one to the effect that the county clerk, by printing the names of candidates irregularly nominated (it was alleged), had committed a fatal error that vitiated enough votes to elect Bowers sheriff. On that contention section 5896 supra of the Australian ballot law was held in judgment. The construction put on that section was to the effect that absent the pre-election challenge provided for in section 5896, as here, the point could not be allowed contestant. We have already quoted so extensively from the Bowers case that we shall not swell this opinion by further excerpts. It should be read with this. It may be said in leaving it that its authority as a philosophical exposition of the law on the question up, once somewhat shaken in this jurisdiction, has been re-established with unanimous emphasis in the Gass-Evans case. The Bowers-Smith case has been cited with approval and followed by more courts of last resort than any other election case ever decided by this court, and the credit reflected on the distinguished jurist who then spoke for the court is shared by the court itself. At the date of the Bowers-Smith case there was but one case that took a contrary view of the Australian ballot law. [Price v. Lush, 10 Mont. 61.] But the doctrine of the Price-Lush case not only never has been followed, but it has been repudiated by the same court. [Stackpole v. Hallahan, 16 Mont. 40.]

The right to contest an election is a statutory right. So, the condition created by the preclusive power in the county clerk to publish a list of candidates and print an official ballot is purely a statutory condition. Now, the general rule is that remedies expressly provided by statute to enforce rights created alone by statute are preclusive. Hence, when the Bowers-Smith case decided that those statutory remedies must be followed and if not followed the objections, if any, to the ticket were waived, it but proceeded on

the broad analogies of the law as well as on those rules of interpretation applicable to election laws as such.

The question whether the pre-election right to challenge irregularities in nominations, as well as in the officially promulgated ballot, is preclusive, has been ruled in several jurisdictions agreeably to the views herein before announced. For example: In Allen v. Glynn, 17 Colo. 338, the holding was to the effect that where public officers are entrusted with the preparation of ballots and ample provision is made for the corrections of errors before election, the general rule is that it is too late after they have been voted to interpose objections to the ballots for mere irregularities in the printing thereof. To the same effect are Stackpole v. Hallahan, 16 Mont., supra; Earl v. Lewis, 28 Utah, 116; and Payne v. Hodgson, 34 Utah, 269. In all those cases statutes were held in judgment substantially the same as our own and it was held, in effect, that in an election contest the contestant cannot question the regularity or validity of the proceedings of conventions or committees in making or filing nominations, nor can the action of the officer whose duty it is to make up the party tickets and prepare the official ballot be reviewed. That can only be done by direct proceedings before the election, so that errors, if found, may be corrected. To the same effect are Baker v. Scott, 4 Idaho, 596; Simpson v. Osborn, 52 Kan. 328; Attorney-General v. Campbell, 191 Mass. 497.

When the case of Atkeson v. Lay, 115 Mo. 538 (much relied on by contestant), is considered, as it must be, in the light of the reasoning of the Punch-Kortjohn case supra, it does not aid contestant's contention.

The Progressive party nominations in the case at bar were made, as said, agreeably to the decision of this court in the Punch-Kortjohn case. We do not hold there were any irregularities in the official ballot in the grouping of candidates or otherwise, but, if there were

any such, we hold a challenge of them came too late after election and the event was determined, where, as in this case, no fraud of any sort is claimed in the election itself.

Canning says that three tailors of Tooley street, Southwark, once addressed a petition of grievances to the House of Commons, beginning—"We, the people of England." It is quite the vogue for historical writers to slyly comment on the naive assumption of those three tailors. To feather darts cast, the sour adages have been applied by humorous commentators: Nine tailors make a man; Four farthings and a thimble make a tailor's pocket jingle; Dull scissors make crooked mouthed tailors, and like *badinage*. In this case no such waggishness is used by learned counsel. They comment with dignity and severity on the assumption of 108 petitioners in Butler county arrogating to themselves the right to nominate a party ticket and designate a party name. But their quarrel must be with the doctrines of the Punch-Kortjohn case; for in that case such right was adjudged. Posterity would think ill either of the candor or understanding of a court that would hold one voice before election, to-wit, to make straight the way for a ticket, and another and different voice after election whereby the voters so authorized would be disfranchised. We may not thus "palter in a double sense," or judicially put such a cup of Tantalus to a voter's lips. *Stare decisis.*

The judgment below seated the man who had the most votes. That was right. Let it be affirmed. It is so ordered.

All concur.