STATE ex rel. James C. BONZON, Relator,

v.

Honorable Noah WEINSTEIN, Judge, Circuit Court of St. Louis County at Clayton, Missouri, Respondent.

STATE ex rel. F. William HUMAN, Jr., et al., Constituting the Board of Election Commissioners of St. Louis County, Missouri, Relators,

v.

Honorable Noah WEINSTEIN, Judge, Circuit Court of St. Louis County at Clayton, Missouri, Respondent.

Nos. 36465, 36466.

Missouri Court of Appeals, St. Louis District.

Sept. 24, 1974.

Hearnes, Padberg, Raack, McSweeney & Slater, Godfrey P. Padberg, St. Louis, for relator James C. Bonzon.

Lewis, Rice, Tucker, Allen & Chubb, F. William McCalpin and Frank P. Wolff, Jr., St. Louis, for relator F. William Human, Jr., et al.

John D. Schneider, St. Louis, for respondent.

McMILLIAN, Judge.

These two writs of prohibition arise out of a primary election contest brought by contestant DeCoursey against contestee-relator Bonzon, the Board of Election Commissioners of St. Louis County, also relators, and the Secretary of State of the State of Missouri. At the primary election in question, Bonzon received one more vote than DeCoursey to win the Democratic Party nomination for state representative from the 106th District. After a preliminary hearing on the contest petition, in which DeCoursey alleged misconduct and irregularities, respondent the Honorable Noah Weinstein indicated to the parties that he would declare the election invalid and order a new election to determine the Democratic nominee. Contestee Bonzon and the Board of Election Commissioners each brought prohibition in this court, seeking our writ commanding respondent to refrain from declaring the election invalid or ordering a new election.

Our preliminary writ of prohibition issued on September 4, 1974. Following briefs and argument on the case, we made the preliminary writ absolute on September 13, and noted that this opinion would follow. Because of the hardship delay in this case would work on the parties, we have not received a transcript of the proceedings below, but have taken the facts as developed by the pleadings and in suggestions and oral arguments.

The election for the 106th District party nominees was conducted in conjunction with the statewide primary elections on August 6, 1974. The results for state representative on the Democratic side, as certified by the election board, showed that contestee Bonzon received 788 votes (778 machine votes and 10 absentee ballots) and contestant DeCoursey 787 votes (781 machine votes and six absentee ballots).[1] The substance of contestant's argument in the court below was that there were two more votes shown as cast on the voting machines than there were persons recorded as having voted by election officials. Respondent cited this discrepancy as the reason for declaring the election invalid and ordering a new election.

As a preliminary matter, we note that the one unique fact behind the legal issues raised on these writs was the use of voting machines, rather than paper ballots, in this election. Respondent argues that where, as here, there is a numerical discrepancy between the number of votes cast as shown on the voting machines and the number of voters recorded as having voted by precinct election officials, the result of the election is placed in enough doubt to allow a judge to declare the election invalid. Presumably the same type of discrepancy in a paper ballot election could have been resolved by resort to statutory recount procedures, because during such a recount individual paper ballots can be examined to determine their authenticity. In an election where voting machines are used, of course, it is impossible to examine individual ballots.

To better understand respondent's argument and the discrepancies in the vote tally in this election, a brief review of the "normal" voting procedures in primaries where voting machines are used will be helpful.

The election board employs three devices at the precinct level to protect against fraud and to ensure that only validly registered persons enter a voting booth. The first is a "yellow" registration card for each voter in a precinct. This card is sup-

---

1. Two other Democratic candidates for the same office received lesser numbers of the ballots cast and are not involved in this action.

plied to precinct election judges on election day, and corresponds to a "white" master card permanently on file with the board.[2] When a particular voter arrives at the polls with the intention of voting, officials mark the date of the election on the yellow registration card in the space after the date entered on the voter's last trip to the polls.

The second protective device is the "comparative signature card," which is handed to each voter who appears at the polls with the intention of voting.[3] The voter places his signature and his precinct number on this card.

That signature card is then passed to one or two election judges—usually one from each political party—and each judge enters the voter's name in the "poll book," which is the third protective device. The poll book is numbered for each entry, and the judge places the number for each voter on the voter's signature card. Since both parties keep poll books, there should be two identical books, one kept by the Democratic judge and one by the Republican judge, at the close of elections.

After the voter's name is entered in the poll book, he hands the numbered signature card to the voting judge at the voting machine. The voter declares his party preference, and the judge "locks out" the vote keys for candidates from the opposing party. The voter then enters the machine and votes.

On the voting machine itself there are two protective devices which count the number of persons who actually vote. The "public counter" inside the machine records the number of voters who enter the machine voting booth and activate a lever which closes the curtains and allows the voter to cast a ballot. This counter is "zeroed" before the day's voting begins. A second counter, the "protective counter" is located outside the machine. This counter is not zeroed and keeps a cumulative total of the number of persons voting from one election to the next. At the end of a day's voting, the numbers on the public and protective counters should match. Other counters in the machine record the number of votes received by each candidate for public office. It should be noted that both the public and protective counters record only the total vote, that is, the number of persons entering the machine to vote. These counters neither distinguish between Democratic or Republican votes, nor votes cast for individual candidates for each office contested.[4]

With these procedures in mind, the discrepancies put at issue by contestant DeCoursey's petition come into sharper focus. Contestant disputed the voting results for the Democratic nomination for state senator at two polling places, Concord 21–42 (a two-precinct polling place) and Concord 44. The pertinent totals on the Democratic side are as follows:

| Polling Place | Dated "Yellow" Registration Cards | Comparative Signature Cards | Names in Poll Book | Number on Machine Counters |
|---|---|---|---|---|
| Concord 21–42 | 541 | 539 | 539 | 540 |
| Concord 44 | 263 | 258 | 258 | 259 |

———◆———

2. See § 113.230, RSMo 1969, V.A.M.S.

3. See § 113.340, RSMo 1969.

4. The curtains in the machine booth will not open until a voter has cast a ballot for at least one person. However, an election judge may activate the "Key 50" device to clear a machine without activating either counter. The use of this device is not in issue in this case.

In the "normal" situation the totals in the columns above for each polling place would coincide exactly. But in the Concord 21–42 and Concord 44 polling places, the above discrepancies turned up and are the substance of respondent's judgment and order.

According to the briefs and oral argument before this court, several explanations for the above discrepancies were put before the court below.

In oral argument it was stated by one of the attorneys for the relator that the difference between the number of dated yellow registration cards and the number of comparative signature cards was not an unusual occurrence in an election.[5] Occasionally a person whose yellow card has been dated and who has been handed a signature card will become impatient with waiting in line to vote and will leave the polling place with the signature card in his hand. It was also stated that one voter, whose yellow card was dated and who had been handed a signature card, walked out of a polling place after being told he could not vote for both Democratic and Republican candidates.

On oral argument relators offered an explanation for the discrepancy between the total number of votes recorded by the machines and the total number of persons voting according to the poll books. Statements were also made in the oral arguments that election judges made up the poll books in polling places in question incorrectly, making entries in the book after each person voted rather than before. According to this explanation, a signature card could have been dropped or lost before being given to the judge in charge of the poll book, or a voter could have walked out of the polling place without turning in his signature card.

Following this explanation, one would expect the number of signature cards to correspond exactly with the number of entries in the poll books. The loss of a signature card could have been detected only if the election judges had compiled the poll books before the voter entered the booth and handed his card to the judge at the voting machine.

Relators further point out that in neither polling place, Concord 21–42 or Concord 44, were there more persons recorded as voting by the machine counters than persons who entered the polling place to vote as recorded by the yellow registration cards. Nor was there any evidence that the two votes in dispute were cast for contestant, or even on the Democratic ticket.

Contestant's petition before respondent was in the alternative, asking for a statutory recount or a judgment of invalidity and an order for a new election. The latter prayer invoked respondent's equitable powers.

On August 26, 1974, respondent held a preliminary hearing on contestant's petition and the facts recited above were presented and argued. Without further hearing, respondent issued his findings and decree. Pertinent findings were that the irregularities cast the election in such doubt that the election was invalid, that two more votes were counted than authorized voters were shown to have voted, the irregularities and discrepancies permeated the entire election, and that to allow the certified results to stand would work a fraud on the voters.

Respondent then invoked his equitable authority to enjoin the Secretary of State from certifying any Democratic nominee from the 106th District, and to order the election board to conduct a new election "under the rules and procedures as are approved by this court." Relators Bonzon and the election board then filed these writs of prohibition.

The issue raised by the writs of prohibition is the jurisdiction of the court

5. Since we have no transcript of the proceeding below, the facts repeated here are based on oral argument and briefs before this court.

below to act as it did.[6] If the lower court had no jurisdiction over the parties or the subject matter of the action, or if the court acted in excess of the jurisdiction with which it was vested, the writ will lie. State ex rel. Vogel v. Campbell, 505 S.W. 2d 54, 58 (Mo. banc 1974). Thus prohibition is defined as essentially a proceeding between two judicial authorities, one superior and one inferior, where the superior judicial authority exercises its superintending power over the inferior authority to keep the matter within its lawful jurisdiction. State ex rel. T. J. H. v. Bills, 504 S.W.2d 76, 78 (Mo. banc 1974). But, as we have cautioned in State ex rel. Shaper v. Stussie, 487 S.W.2d 49 (Mo. App.1972), prohibition will not correct error unmixed with jurisdictional matters in a lower court, for a court may act within its jurisdiction and decide wrongly.

■ Since election contests are statutory actions, State ex rel. Camillo v. Hess, 458 S.W.2d 721 (Mo.App.1970), the jurisdiction of the circuit court is defined by the election statutes and "the letter of the law is the limit of (its) power." State ex rel. Phillips v. Barton, 300 Mo. 76, 254 S. W. 85, 89 (Banc 1923).

In primary election contests, § 124.020, RSMo., vests a circuit court with the jurisdiction to hear contests and then specifies the procedure to be followed. Subsection 5 of that statute provides that the circuit court shall hold a preliminary hearing on the contest "to determine whether there shall be a recount and *not to determine what the recount would show*." (Emphasis ours.) The subsection states that the court shall order a recount if the contestant makes a prima facie showing to cast the result of the election "in doubt." The subsection further allows the contestant to introduce evidence bearing on "the validity of the election or any ballot cast." If the court determines that a recount shall be ordered, the subsection allows "any party" to introduce evidence bearing on the validity of the election or any ballot cast while the recount is in progress.

After the procedures governing preliminary and subsequent hearings have been completed, § 124.040, R.S.Mo., gives the court the power to "render its judgment based upon the issues of law and fact *determined as herein set forth*." (Emphasis ours.) The same section also delineates the procedures to be followed on a recount.

■ Even the truncated record before us discloses that respondent failed to observe the procedures outlined above. Only a preliminary hearing on the contest was conducted, following which respondent entered his findings and conclusions and judgment, contrary to the command in § 124.020(5) that the preliminary hearing should not serve "to determine what the recount would show." No recount of any kind was ordered, contrary to the express commands of § 124.020 and § 124.040. And contrary to the clear meaning of both of these statutes, respondent did not conduct subsequent hearings during and after a recount to inquire into the validity of the election or any ballot cast. Despite these procedural shortcomings, respondent in his judgment declared the election invalid, a step long recognized as a drastic remedy because it amounts to disenfranchisement of the voters. Elliott v. Hogan, 315 S.W.2d 840, 846 (Mo.App.1958); Nance v. Kearbey, 251 Mo. 374, 158 S.W. 629, 632 (Banc 1913).

---

6. The writer has reservations about entertaining the extraordinary writ in this case. Prohibition is a discretionary remedy and should be denied where an adequate remedy by appeal exists. State ex rel. T. J. H. v. Bills, 504 S.W.2d 76 (Mo. banc 1974). In election contests, the statutes, specifically § 124.050, RSMo., provide for a speedy and adequate appeal from trial court judgments, and this remedy could have been pursued here without prejudice to any of the parties. However, since the provisional writ has issued, and the case has been briefed and argued here, the court should proceed with its consideration of the writ. See comment by Bardgett, J., in State ex rel. McClellan v. Kirkpatrick, 504 S.W.2d 83, 85, note 1 (Mo. banc 1974).

Respondent argues, however, that a recount would have been meaningless since voting machines were used in this election and the recount provision in the statutes was directed only to paper ballot elections. It might be that recount in this case would establish nothing to assist respondent in adjudicating the contest. But the statutory requirement for a recount is clear, and we cannot assume that the legislature meant to exclude elections in which voting machines are used from this requirement. Section 124.020 in its present form was enacted in the 1972 session of the legislature, when the legislators were well aware that voting machines were in wide use in the state. If in fact recount procedures are, as respondent argues, "useless" in cases of this type, the matter is one for legislative, not judicial, action.

The present requirement of §§ 124.-020 and 124.040 is that a recount shall precede any judgment by the circuit court on the result or validity of an election, although the court may hear evidence bearing on these issues before and during the recount. We find, therefore, that respondent exceeded the jurisdiction with which he was vested by statute in proceeding to a judgment on the contest without following the procedures outlined by the statutes.

Even if we assume that respondent is correct in his contention that he had jurisdiction to proceed to a judgment in this case without observing the strict requirements of the statutes, we find that respondent erred in finding that the election here was "in doubt" to such a degree to justify a judgment that it was invalid.

The evidence produced by the contestant in this case shows only that contestant received one less vote than contestee and that two votes recorded on the voting machines cannot be accounted for in the poll books, although they can be accounted for on the registration cards. There is no evidence to show that the two votes in issue were voted on the Democratic ticket on which both contestant and contestee, as well as two other candidates, appeared. There is no evidence to show that these two votes were cast for contestant. There is no way of knowing, therefore, whether the disputed votes were cast in the Democratic race, or whether they were cast for contestant.

While these facts do cast some doubt on the election in question, the degree of doubt is very slight. The irregularities complained of can be explained in a number of ways, only one of which is that the election is so hopelessly distorted that it must be invalidated. The doubt shown here might be sufficient to justify a recount under § 124.020(5), but it is clearly not sufficient to entitle contestant to a judgment that he was the victor. To be given such a judgment, the law is well-established that "an unsuccessful candidate has the burden of proving that a majority of the legal votes cast at the election were *in his favor*, . . ." Phelps v. Feniz, 345 Mo. 440, 134 S.W.2d 84, 88 (Banc 1939) (Emphasis ours.) Further, "it is not alleged (or proved that) any legal votes were cast for contestant and counted or returned for contestee. It is not alleged (or proved that) specified mistakes were made in favor of (contestee) and against (contestant) by the judges and clerks in counting the votes, or otherwise." Armantrout v. Bohon, 349 Mo. 667, 162 S.W.2d 867, 872 (1942) (citing Hale v. Stimson, 198 Mo. 134, 146, 95 S.W. 885, 887).

It is clear, then, that the irregularities contestant here complains of do not cast the election in such doubt to result in a judgment of election victory in his favor, so the question remains whether such minimal doubt will justify a judgment that the election is invalid.

Section 124.020 does *imply* and Missouri cases do recognize that under some circumstances an election may be declared invalid. In Armantrout v. Bohon, *supra, 162 S.W.2d at 871*, the court said that absent fraud "an election will not be

annulled even if certain provisions of the law regarding elections have not been strictly followed." Citing Armantrout, the court in Bernhardt v. Long, 357 Mo. 427, 209 S.W.2d 112, 117 (Mo.1948) said that, "the facts, to be sufficient to nullify the result of a school election, must show a violation of mandatory statute or such other conduct as usually invalidates an election." The facts in this case disclose no violation of a mandatory statute. Nor was there "such other conduct" as was found in the only two Missouri cases we find in which an election was declared invalid: State ex rel. Miles v. Ellison, 269 Mo. 151, 190 S.W. 274 (Banc 1916) and State ex inf. McKittrick ex rel. Martin v. Stoner, 347 Mo. 242, 146 S.W.2d 891 (1941).

In fact, all contestant has shown in this case is an irregularity, and he has failed to show that the irregularity worked to his detriment. In view of the nature of the irregularity, respondent has apparently overlooked or dismissed a critical fact—that there were more dated yellow registration cards, and thus more eligible voters appearing at the polls, than voters counted on the machine counters. Many things, purely innocent on the part of the election officials or the voters could have occurred which would explain the numerical discrepancies admitted here. To set aside every primary election in a whole district for irregularities or discrepancies in one or.two precincts would not be in the best interests of the political process. If this is what the legislature so intended or desires, such authority should be clearly spelled out in statutory form.

In Elliott v. Hogan, supra, the court held that irregularities of the type shown here should not be cause for drastic interference with the electoral process:

> "And it has been held that where the irregularity has been such as not to have interfered with a full and fair expression of the voters' choice, particularly where it is a mistake of an election official, the irregularity should not result in the disenfranchisement of the voters."

See also Bowers v. Smith, 111 Mo. 45, 20 S.W. 101 (1892); State ex rel. Miles v. Ellison, supra; and Breuninger v. Hill, 227 Mo. 239, 210 S.W. 67 (Banc 1919).[7] No candidate expects nor will he receive a perfect election; he can expect a fair and open one in which the electorate may freely express their will.

The decisions relied upon by respondent are all distinguishable.[8] The Missouri cases do not resolve the precise issues presented. Authority from other states allow a court to order a new election only when so authorized by statute or when fraudulent conduct is clearly proven. In the New York cases, for example, the courts recognize that while they are given power to order a new election in a primary, they are

---

7. In Bowers v. Smith, 111 Mo. 45, 20 S.W. 101, 106 (Banc 1892), the court warned: "If for every error of a county clerk, or harmless irregularity in election procedure, citizens, having no control over either, are to lose their right of choosing public officers, the 'reform ballot act,' instead of being found an improvement of the machinery of popular government, will justly be denounced as a 'snare to entrap the unsuspecting voter.'" In Nance v. Kearbey, 251 Mo. 374, 158 S.W. 629, 632 (Banc 1913), the court drew a similar warning from a Canadian authority: "'It must be borne in mind,' says Blake, V.C., in Grant v. McCallum, 12 Can.L.J.N.S. l.c. 114, 'that if the court lightly interferes with elections on account of errors of the officers employed in their conduct, a very large power may thus be placed in the hands of these men. That which arises from carelessness to-day may be from a corrupt motive to-morrow, and thus the officer is enabled, by some trivial act or omission, to serve some sinister purpose, and to have an election avoided, and at the same time to run but little chance of the fraudulent intent being proved against him.'"

8. Akizake v. Fong, 51 Haw. 354, 461 P.2d 221 (1969); Santucci v. Power, 33 A.D. 2d 517, 304 N.Y.S.2d 926 (1969); Terry v. Sencindiver, 153 W.Va. 651, 171 S.E.2d 480 (1969); Creamer v. City of Anderson, 240 S.C. 118, 124 S.E.2d 788 (1962); Hayes v. Abney, 186 Miss. 208, 188 So. 533 (1939); Marilla v. Ratterman, 209 Ky. 409, 273 S.W. 69 (1925); Sailor v. Rankin, 125 Ark. 557, 189 S.W. 357 (1916).

 

not authorized in the absence of statute to order a new election for a general election.

We find, therefore, that respondent did not have before him such fraud or major irregularities or misconduct to justify a finding that the election here was invalid, and that respondent erred in entering his decree invalidating this election and ordering a new election.

Accordingly, our preliminary writ is made absolute.

DOWD, C. J., and SIMEONE, and KELLY, JJ., concur.

WEIER, J., not participating.