# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 06-3014

———————

| | | |
|---|---|---|
| Missouri Protection and Advocacy Services, Inc., et al., | * | |
| | * | |
| | * | |
| Plaintiffs - Appellants, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Robin Carnahan, in her official | * | Western District of Missouri. |
| capacity as Secretary of State of the | * | |
| State of Missouri; Jeremiah Nixon, | * | |
| in his official capacity as Attorney | * | |
| General of the State of Missouri, | * | |
| | * | |
| Defendants - Appellees. | * | |

———————

Submitted: February 12, 2007
Filed: August 23, 2007

———————

Before LOKEN, Chief Judge, O'CONNOR, Associate Justice (Ret.),[*] and GRUENDER, Circuit Judge.

———————

LOKEN, Chief Judge.

This is a lawsuit by three Missouri residents and a non-profit advocacy organization, Missouri Protection and Advocacy Services, Inc. (MOPAS), who allege

———————

[*]The HONORABLE SANDRA DAY O'CONNOR, Associate Justice, Supreme Court of the United States (Ret.), sitting by designation.

that Missouri law violates the Equal Protection Clause; Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131-12165; and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 by disqualifying persons under court-ordered guardianship from voting.  Plaintiffs seek injunctive and declaratory relief. Defendants are the Missouri Secretary of State, Robin Carnahan, and the Missouri Attorney General, Jeremiah Nixon, who are sued only in their official capacities.  The claims of two individual plaintiffs were dismissed without prejudice at their request. The district court[1] denied MOPAS and the third individual, Bob Scaletty, relief on the merits after rejecting defendants' threshold arguments that the case is moot, that plaintiffs lack standing, and that these State officers are not proper defendants. MOPAS and Scaletty appeal.  We affirm though on somewhat different grounds.

## I.  The Missouri Laws at Issue

Article VIII, § 2, of the Missouri Constitution, as amended in 1958, broadly grants the right to vote to "[a]ll citizens of the United States . . . over the age of eighteen who are residents of this state" but then provides that "no person who has a guardian . . . by reason of mental incapacity, appointed by a court of competent jurisdiction . . . shall be entitled to vote."  This prohibition has a long history.[2]  The Missouri Constitution of 1875 barred from voting persons kept at poorhouses and other asylums at public expense.  Art. 8, § 2.  The Constitution of 1945 provided that "no idiot, no insane person and no person while kept in any poorhouse at public expense . . . shall be entitled to vote."  Art. VIII, § 2.  The 1958 amendment tying the

---

[1]The HONORABLE ORTRIE D. SMITH, United States District Judge for the Western District of Missouri

[2]As States expanded the right to vote in the nineteenth century, most adopted constitutional provisions disqualifying persons who were idiots, insane, of unsound mind, or under guardianship.  Today, thirty-eight state constitutions retain provisions of this type.  See Sammin & Hurme, Guardianship and Voting Rights, ABA "Bifocal," Fall 2004, at 11-13, available at www.abanet.org/aging/publications/bifocal/261.pdf.

prohibition to court-ordered guardianship was intended "to give polling officials something tangible on which to decide whether a person was disqualified by reason of his mental condition." New v. Corrough, 370 S.W.2d 323, 327 (Mo. 1963).

The Missouri election laws implement Article VIII, § 2, by providing, "No person who is adjudged incapacitated shall be entitled to register or vote." Mo. Rev. Stat. § 115.133.2. The parties in this case do not argue that § 115.133.2 disqualifies more adults from voting than the prohibition set forth in Article VIII, § 2. Such a contention would conflict with well-established principles -- that Missouri's election laws "must be liberally construed in aid of the right of suffrage," Nance v. Kearbey, 158 S.W. 629, 631 (Mo.banc 1913); that the right of citizens who possess the enumerated constitutional qualifications to vote "may be regulated by statute although not lightly denied or abrogated," State ex rel. McClellan v. Kirkpatrick, 504 S.W.2d 83, 88 (Mo.banc 1974); and that "voting rights are an area where our state constitution provides greater protection than its federal counterpart," Weinschenk v. State of Missouri, 203 S.W.3d 201, 212 (Mo. banc 2006). Thus, while no Missouri appellate court has addressed the question, we are confident that the Supreme Court of Missouri would construe the term "adjudged incapacitated" in § 115.133.2 as having the same meaning as the term "has a guardian [appointed] by reason of mental incapacity" in Article VIII, § 2.

The Missouri Probate Code authorizes the appropriate probate court[3] to appoint a qualified guardian for an adult if a hearing has established "by clear and convincing evidence that the person for whom a guardian is sought is incapacitated as defined in this law." Mo. Rev. Stat § 475.079.1. An "incapacitated person" is defined as:

---

[3]In Missouri, the probate court is the probate division of the circuit court, the trial court with original jurisdiction over all civil and criminal cases. See Mo. Rev. Stat. §§ 472.020, 478.070.

one who is unable by reason of any physical or mental condition to receive and evaluate information or to communicate decisions to such an extent that he lacks capacity to meet essential requirements for food, clothing, shelter, safety or other care such that serious physical injury, illness, or disease is likely to occur. Mo. Rev. Stat. § 475.010(9).

The Probate Code defines a "partially incapacitated person" as one who "lacks capacity to meet, *in part*," these essential requirements. § 475.010(14) (emphasis added). The distinction is significant. An adjudication of partial incapacity imposes only those legal disabilities "specified in the order of adjudication," § 475.078.1, whereas an adjudication of full incapacity imposes "all legal disabilities provided by law, except to the extent specified in the order of adjudication," § 475.078.2.[4] In either case, the probate court must apply a "least restrictive environment" principle, imposing "only such restraint as is necessary to prevent [the ward] from injuring himself and others and to provide him with such care, habilitation and treatment as are appropriate for him considering his physical and mental condition and financial means." § 475.010(10); see § 475.075.10. If the court finds the person partially incapacitated, it "shall appoint a limited guardian" and "shall impose only such legal disabilities and restraints on personal liberty as are necessary to promote and protect the well-being of the individual." § 475.080.1.

## II. An Eleventh Amendment Issue

At the outset, defendants argue that the Missouri Secretary of State and Attorney General have no real connection with the enforcement of Missouri's laws regarding the loss of voting rights by persons under guardianship and therefore this suit is barred by the Eleventh Amendment. Like the district court, we disagree.

---

[4]The parties agree that the ban on voting in § 115.133.2 is a "legal disability" within the meaning of § 475.078.2.

-4-

A State's Eleventh Amendment immunity "does not bar a suit against a state official to enjoin enforcement of an allegedly unconstitutional statute, provided that such officer [has] some connection with the enforcement of the act." Reprod. Health Servs. of Planned Parenthood of the St. Louis Region, Inc. v. Nixon, 428 F.3d 1139, 1145 (8th Cir. 2005) (quotation omitted). Though broad authority to register voters and to administer voting and elections is delegated to local "election authorities" -- the county clerk or the local board of election commissioners -- the Secretary of State is "the chief state election official responsible for overseeing of the voter registration process." See Mo. Rev. Stat. §§ 115.015, 115.141, 115.023.1, 115.155, 115.160.3. Moreover, § 115.195.3 obligates the Secretary of State to send local election authorities the names of persons who are adjudged incapacitated. As we will explain, Bob Scaletty was prevented from voting in the 2004 election by an error that may well have stemmed from his inclusion on a list of persons under guardianship that did not note the preservation of his right to vote. Finally, Missouri statutes appoint the Secretary of State as the "chief state election official" to administer the federal Help America Vote Act of 2002 and the National Voter Registration Act of 1993. See Mo. Rev. Stat. § 28.035, § 115.136.

The Attorney General has statutory authority to represent the state in both criminal and civil cases. See Mo. Rev. Stat. § 56.060.1; § 27.030; § 27.060. Persons who knowingly attempt to vote when they are ineligible -- which presumably would include persons under guardianship due to mental incapacity -- can be prosecuted for committing a class one election offense. See Mo. Rev. Stat. § 115.631(2).

The summary judgment record reflects considerable uncertainty, inconsistency, and apparent confusion among local guardians and election officials concerning the proper interpretation of the Missouri laws at issue. In these circumstances, we conclude that the Secretary of State and the Attorney General were potentially proper parties defendant for the injunctive relief sought had plaintiffs prevailed on the merits.

Accordingly, the Ex parte Young exception to Eleventh Amendment immunity applies.  See Reprod. Health Servs., 428 F.3d at 1145.

## III.  Equal Protection Claims

In the last fifty years, the Supreme Court has considered many cases involving various aspects of the right to vote.  "[S]ince the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized."  Kramer v. Union Free School Dist. No. 15, 395 U.S. 621, 626 (1969).  The Court's concern with these difficult issues is understandable, though the resulting array of opinions deciding disparate voting issues can be difficult to apply in a new context.

This case concerns a State's eligibility requirement for voting.  Historically, deciding who is qualified to vote has been a relatively unfettered prerogative of the sovereign States.  See Rodriguez v. Popular Democratic Party, 457 U.S. 1, 9 (1982) ("the right to vote, *per se*, is not a constitutionally protected right").  "The States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised . . . absent of course the discrimination which the Constitution condemns."  Lassiter v. Northampton County Bd. of Elections, 360 U.S. 45, 50-51 (1959) (upholding a race-neutral literacy test because literacy "has some relation to standards designed to promote intelligent use of the ballot").

More recent decisions have given varying degrees of "close constitutional scrutiny" to voter eligibility requirements under the Equal Protection Clause, invalidating many, but not all.  See Harper v. Va. State Bd. of Elections, 383 U.S. 663, 668 (1966) (poll tax invalid because "[w]ealth, like race . . . is not germane to one's ability to participate intelligently in the electoral process"); Carrington v. Rash, 380 U.S. 89 (1965) (categorical disenfranchisement of residents in the military invalid);

Kramer, 395 U.S. at 632-33, and Cipriano v. City of Houma, 395 U.S. 701, 704-706 (1969) (limiting right to vote in local elections to those with special interests invalid); Evans v. Cornman, 398 U.S. 419 (1970) (disenfranchising residents of a federal enclave invalid); compare Dunn v. Blumstein, 405 U.S. 330, 360 (1972) (one year and three-month durational residence requirements invalid), with Marston v. Lewis, 410 U.S. 679 (1973) (fifty-day durational residence requirement valid). By contrast, in Richardson v. Ramirez, 418 U.S. 24, 55 (1974), the Court rejected a challenge to California laws denying ex-felons the right to vote in part because the Equal Protection Clause of § 1 of the Fourteenth Amendment "could not have been meant to bar outright a form of disenfranchisement which was expressly exempted from the less drastic sanction of reduced representation which § 2 imposed for other forms of disenfranchisement."

1. The essential factual predicate for plaintiffs' facial attack on the Missouri constitutional and statutory provisions at issue is the assertion that an order appointing a full guardian for a Missouri ward found to be "incapacitated" necessarily imposes a categorical ban on voting. Article VIII, § 2, of the Missouri Constitution disqualifies persons placed under guardianship "by reason of mental incapacity" from voting. The Probate Code authorizes appointment of a guardian for a broader class of adults, those unable to care for themselves "by reason of any physical or mental condition." Mo. Rev. Stat. § 475.010(9). Yet the Missouri election code provides that any person "who is adjudged incapacitated" may not vote. Therefore, plaintiffs argue, Missouri violates the Equal Protection Clause by denying the right to vote to adults not disqualified by Article VIII, § 2, of the Missouri Constitution.

If, as plaintiffs contend, appointment of a full guardian categorically prohibited the ward from voting because he or she was "adjudged incapacitated" within the meaning of § 115.133.2 of the election laws, these statutes would not withstand close equal protection scrutiny when challenged, for example, by a person whose guardian was appointed solely because of a physical disability. However, as the district court

recognized, Scaletty's full guardianship order expressly preserved his right to vote, confirming that Missouri probate courts retain the authority to preserve a ward's right to vote as part of the statutory mandate to minimize deprivation of a ward's liberty.[5] Thus, plaintiffs' primary facial challenge fails for lack of proof.

2. Having failed to establish that Missouri law categorically disenfranchises persons under full guardianship, MOPAS alternatively argues that Article VIII, § 2, of the Missouri Constitution is nonetheless *facially* invalid. MOPAS does not assert any claim of direct injury to the organization, like the claim asserted in Miss. Prot. & Advocacy Sys., Inc. v. Cotten, 929 F.2d 1054 (5th Cir. 1991). Rather, MOPAS asserts only associational claims on behalf of developmentally disabled persons it is authorized by Missouri and federal law to represent.[6] Defendants argue that MOPAS lacks associational standing to assert this claim. We agree.

The Fifth Circuit has held that a federally funded advocacy organization lacked standing to assert associational claims on behalf of disabled individuals because the

---

[5]The summary judgment record reflects that, while local probate practices vary, other Missouri wards under full guardianships have also had their voting rights specifically preserved. Judicial support for this construction of the statutes is found in Estate of Werner, 133 S.W.3d 108, 109 (Mo. App. 2004), where the Court of Appeals affirmed a guardianship order reinstating the ward's voting rights, although that portion of the order was not at issue on appeal. See also 5C Borron, Jr., Missouri Practice: Probate Law & Practice § 1966, at 488 (3d ed. 2000) ("Even though the statute contemplates a potential total deprivation of civil rights, nevertheless, consistent with the least restrictive environment principle, the court may . . . except from the order of adjudication specified rights."); 3 Borron, Jr., Missouri Practice: Probate Forms Manual Form 4.18, at 498 (2d. ed. 1997) (model "Judgment of Total Incapacity" preserving the ward's right to vote).

[6]MOPAS is a private entity designated by Missouri to advocate for those with mental disabilities, as required by the Protection and Advocacy for Mentally Ill Individuals Act of 1986, 42 U.S.C. §§ 10801 *et seq*., and the Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. §§ 15001 *et seq*.

-8-

organization "bears no relationship to traditional membership groups because most of its 'clients' . . . are unable to participate in and guide the organization's efforts." Ass'n for Retarded Citizens of Dallas v. Dallas County Mental Health & Mental Retardation Ctr. Bd. of Trustees, 19 F.3d 241, 244 (5th Cir. 1994). In a later case, a district court surveyed associational standing precedents and concluded that a federally funded advocacy organization lacked associational standing because it did not sue "on behalf of specific individuals who themselves have allegedly suffered concrete harm as a result of the defendant's actions." Tenn. Prot. & Advocacy, Inc. v. Bd. of Educ., 24 F. Supp. 2d 808, 815-16 (M.D. Tenn. 1998). For the following reasons, we agree with these decisions.

An association has standing to bring suit on behalf of its members if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977). The third requirement is a prudential limitation on standing that may be abrogated by Congress, not an element of the case or controversy limitation on federal judicial power contained in Article III of the Constitution. United Food & Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 557 (1996).

Here, the record is silent as to whether persons under guardianship orders are members of MOPAS; it is fair to infer that those persons are only MOPAS "constituents." The lack of members with individual standing was also true in Hunt, where suit was brought, not by a traditional trade association, but by a state agency formed to advocate on behalf of apple growers and dealers. The Supreme Court held that the state agency nonetheless satisfied the first requirement of associational standing because, "for all practical purposes, [it] performs the functions of a traditional trade association" and because -

while the apple growers and dealers are not "members" of the Commission in the traditional trade association sense, they possess all of the indicia of membership in an organization. They alone elect the members of the Commission; they alone may serve on the Commission; they alone finance its activities, including the costs of this lawsuit, through assessments levied upon them.

432 U.S. at 344-45. Here, however, as the Fifth Circuit held in A.R.C. of Dallas, 19 F.3d at 244, the "constituents" of MOPAS have no such relationship to the organization. Therefore, MOPAS appears to fail the first requirement of associational standing, which is an element of an Article III case or controversy.

Even if MOPAS could satisfy the first requirement of associational standing, it cannot satisfy the third requirement because the specific claim asserted and the relief requested require participation in the lawsuit by individual persons with specific claims.[7] MOPAS concedes that States may constitutionally prohibit the mentally incompetent from voting. MOPAS argues that the Missouri regime is unconstitutional because plaintiffs' expert witness opined that, applying a definition of mental capacity he considers appropriate, some Missouri wards whose guardianship orders do not preserve their right to vote have the mental capacity to vote. With the constitutional inquiry framed in this level of detail, the lawsuit may not properly go forward without the participation of one or more individual wards with specific claims based upon a particular incapacity and a record reflecting the basis upon which Missouri officials have denied the right to vote.

In Missouri, the judicial proceeding to determine whether a guardian should be appointed is individualized and protective of civil liberties. The finding necessary to

---

[7]Congress has not abrogated prudential standing requirements by expressly authorizing this type of global challenge to state programs absent the participation of individuals seeking redress of specific injuries. See 42 U.S.C. §§ 10804(c), 10807.

appoint a guardian -- that a person is unable to receive and evaluate information or communicate decisions -- is indicative of a "mental incapacity" to vote within the meaning of Article VIII, § 2. Absent participation by an individual ward who has been denied the right to vote because a guardian was appointed for reasons other than "mental incapacity," the inquiry urged by MOPAS is too abstract. It invites nothing more than an impermissible advisory opinion by a lower federal court on an issue of voter eligibility that must be decided in the first instance by the State.[8]

3. Bob Scaletty asserts a distinct as-applied equal protection claim, based on the action of election officials in refusing him the right to vote in the 2004 elections. Scaletty was diagnosed with paranoid schizophrenia, adjudged incapacitated, and placed under "full" guardianship in 1999. The guardianship order gave control of his possessions, medical care, education, support, maintenance, and general decision-making to the Jackson County Public Administrator. However, the order expressly provided that Scaletty retained the right to vote.

In 2004, the Kansas City Election Board advised Scaletty that he was not eligible to vote because he was under a guardianship order. Polling officials did not permit him to vote in the 2004 election. This action was obviously a mistake, because it was contrary to the right to vote expressly preserved in Scaletty's guardianship order. In December 2004, plaintiffs filed an amended complaint adding Scaletty as

[8]The blanket disenfranchisement of those who are mentally incapacitated may be a subject warranting equal protection inquiry. See Tenn. v. Lane, 541 U.S. 509, 524 & n.5 (2004), criticizing, though not in constitutional terms, state laws categorically disqualifying "idiots" from voting; Richardson v. Ramirez 418 U.S. at 86 (Marshall, J., dissenting) ("measured against the standards of this Court's modern equal protection jurisprudence, the blanket disenfranchisement of ex-felons cannot stand"). But MOPAS does not make this facial argument. Until the Supreme Court rules to the contrary, we are governed by the principle that a non-discriminatory voting restriction that is "found to promote intelligent use of the ballot" will be upheld. San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 36 n.79 (1973).

an additional plaintiff.  In January 2005, having learned of their mistake, the Election Board promptly corrected the error by issuing Scaletty an Official Voter Identification Card and sending his guardian a letter advising that "Mr. Scaletty may vote in the next election."

Defendants argue that Scaletty's as-applied claim is moot because local election officials have acknowledged his right to vote.  In general, a pending claim for injunctive relief becomes moot when the challenged conduct ceases and "there is no reasonable expectation that the wrong will be repeated." Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc., 138 F.3d 351, 354 (8th Cir. 1998) (quotation omitted). Plaintiffs contend, and the district court agreed, that a more stringent standard of mootness should apply -- "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice unless it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 609 (2001) (quotation omitted).  But here, as in Comfort Lake, the cessation was not truly voluntary.  When made aware that Scaletty's guardianship order preserved his right to vote, local election officials advised they would allow Mr. Scaletty to vote in the next election.  As state law required them to obey that court order, there is no reasonable expectation that their 2004 error will be repeated.

The problems with the present posture of Scaletty's as-applied claim go beyond mootness. The lawsuit has effectively remedied his only injury, yet Scaletty continues to pursue broad equitable relief to remedy perceived injury to others who are under Missouri guardianship orders.  This he may not do.  First, *his* claim for equitable relief fails on the merits because the specific mistake made by election officials in 2004 does not warrant prospective relief, and Scaletty has not sued for damages. See City of Los Angeles v. Lyons, 461 U.S. 95, 111-12 (1983).  Second, Scaletty was not injured by the alleged facial flaws in the Missouri regime -- *his* guardianship order expressly

-12-

preserved his right to vote -- and he has no standing to assert the claims of others. <u>See</u> <u>Lewis v. Casey</u>, 518 U.S. 343, 357-60 (1996); <u>Steger v. Franco, Inc.</u>, 228 F.3d 889, 893 (8th Cir. 2000). Third, as explained, his claim for equitable relief is moot. <u>See</u> <u>also</u> <u>Elizabeth M. v. Montenez</u>, 458 F.3d 779, 784-85 (8th Cir. 2006); <u>Grandson v.</u> <u>Univ. of Minn.</u>, 272 F.3d 568, 574-75 (8th Cir. 2001).

## IV. ADA/Rehabilitation Act Claims

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act provides the same rights, procedures, and remedies against discrimination by recipients of federal funding. <u>See</u> <u>Barnes v. Gorman</u>, 536 U.S. 181, 184-85 (2002). In arguing that Missouri's guardianship voting laws violate these statutes, plaintiffs rely primarily on their contention that Missouri categorically prohibits those under full guardianship from participating in a state program or activity -- voting -- on the basis of a disability -- lack of self-care ability -- without an individualized inquiry into whether the ward is mentally competent to vote. As we have explained, this claim fails for failure to prove that the prohibition is categorical.

Alternatively, MOPAS argues that the Missouri regime violates these federal statutes because it creates an unwarranted presumption that a person placed under guardianship is incompetent to vote. Defendants argue that Title II and the Rehabilitation Act do not restrict the authority of States to determine voter eligibility because Congress did not make "unmistakably clear" its intent to interfere with this fundamental aspect of state sovereignty. <u>Gregory v. Ashcroft</u>, 501 U.S. 452, 460 (1991) (quotation omitted). We conclude that MOPAS lacks associational standing to assert these statutory claims.

In Southeastern Community College v. Davis, 442 U.S. 397, 413 (1979), the Court held that "Section 504 imposes no requirement upon an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person." Accord Alexander v. Choate, 469 U.S. 287, 300 (1985). In Tennessee v. Lane, 541 U.S. at 532, the Court confirmed that Title II "does not require States to compromise their essential eligibility criteria for public programs." In section 8(a) of the National Voter Registration Act of 1993, Pub. L. No. 103-31, passed three years *after* Title II of the ADA, Congress specifically preserved the States' authority to make mental capacity a voting eligibility requirement. See 42 U.S.C. § 1973gg-6(a)(3)(B). In light of these authorities, *if* Title II imposes any substantive restriction on Missouri's power to make mental capacity an "essential eligibility requirement" for voting -- an issue we need not decide -- adjudication of the proper extent of that restriction requires full participation by one or more individual wards whose mental incapacity has disqualified them from voting.

## V. Conclusion

For the foregoing reasons, we conclude that the facial attacks by Scaletty and by MOPAS on the alleged categorical ban fail on the merits, that Scaletty's as-applied attack fails for a number of interrelated reasons, and that MOPAS lacks associational standing to assert non-categorical equal protection and statutory claims absent participation in the lawsuit by one or more wards with individual standing to raise those claims. Accordingly, the judgment of the district court is affirmed.

_____

-14-